## TRENWICK AMERICA LITIGATION TRUST, Plaintiff,

v.

ERNST & YOUNG, L.L.P.; PriceWaterhouseCoopers, L.L.C.; Baker & McKenzie L.L.P.; Milliman, Inc.; James F. Billett, Jr.; Stephen H. Binet; Anthony S. Brown; Richard E. Cole; Robert M. DeMichele; Neil

Dunn; Paul Feldsher; Robert A. Giambo; Frank E. Grzelecki; Alan L. Hunte; P. Anthony Jacobs; James E. Roberts; Joseph D. Sargent; Frederick D. Watkins; And Stephen R. Wilcox, Defendants.

C.A. No. 1571–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 2, 2006.

Decided: Aug. 10, 2006.

---

Neil B. Glassman, and Peter B. Ladig, The Bayard Firm, Wilmington, DE; Paul B. Lackey, and Elizabeth K. Stepp, Lackey Hershman, L.L.P., Dallas, TX, for Plaintiff.

Allen M. Terrell, Jr., Richard P. Rollo, Richards, Layton & Finger, P.A., Wilmington, DE; William B. Dawson, J. Stuart Tonkinson, Vinson & Elkins, L.L.P., Dallas, TX, for Defendant Ernst & Young, L.L.P.

A. Gilchrist Sparks, III, and Alan J. Stone, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Howard M. Shapiro, Jonathan E. Paikin, Kyle M. DeYoung, and Will L. Crossley, Jr., Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, DC, for Defendant PriceWaterhouseCoopers, L.L.C.

Arthur G. Connolly, III, Connolly Bove Lodge & Hutz, L.L.P., Wilmington, DE; Howard W. Gutman, George A. Borden and Ryan T. Scarborough, Williams & Connolly, L.L.P., Washington, DC, for Defendant Baker & McKenzie, L.L.P.

Brett D. Fallon, and Joseph S. Naylor, Morris, James, Hitchens & Williams, L.L.P., Wilmington, DE; R. Timothy Muth and Ryan S. Stippich, Reinhart Boerner Van Deuren, Milwaukee, WI, for Defendant Milliman, Inc.

J. Travis Laster, Abrams & Laster, L.L.P., Wilmington, DE; Richard W. Reinthaler, Michael C. Hefter, and Konstantin Chelney, Dewey Ballantine, L.L.P.,

New York City, for Defendants James F. Billett, Jr., Stephen H. Binet, Anthony S. Brown, Richard E. Cole, Robert M. De-Michele, Neil Dunn, Paul Feldsher, Robert A. Giambo, Frank E. Grzelecki, Alan L. Hunte, Anthony Jacobs, James E. Roberts, Joseph D. Sargent, Frederick D. Watkins, and Stephen R. Wilcox.

## OPINION

STRINE, Vice Chancellor.

This case is unusual. The primary defendants in this case were directors of a publicly listed insurance holding company. All but one of the eleven directors was an independent director. The other director was the chief executive officer of the holding company.

In 1998, the holding company embarked on a strategy of growth by acquisition. Within a span of two years, the holding company acquired three other unaffiliated insurance companies in arms-length transactions. The two transactions at issue in this case involved the acquisition of publicly-traded entities and were approved by a vote of the holding company's stockholders. The holding company's stockholder base was diverse and the company had nothing close to a controlling stockholder.

In connection with the last acquisition, the holding company redomiciled to Bermuda, for the disclosed reason that tax advantages would flow from that move. Consistent with the objective of reducing its tax burden, the holding company reorganized its subsidiaries by national line, creating lines of United States, United Kingdom, and Bermudan subsidiaries. As a result of that reorganization, the holding company's top U.S. subsidiary came to be the intermediate parent of all of the holding company's U.S. operations. The top U.S. subsidiary also continued and deepened its role as a guarantor of the holding company's overall debt, including becoming a primary guarantor of $260 million of a $490 million line of credit, a secondary guarantor of the remainder of that debt, and assuming the holding company's responsibility for approximately $190 million worth of various debt securities. Nonetheless, after that reorganization, the financial statements of just the top U.S. subsidiary indicated that it had a positive asset value of over $200 million.

In 2003, the holding company had to place its insurance operations in run-off globally. The holding company and its top U.S. subsidiary filed for bankruptcy. The cause of the failure was that the claims made by the insureds against the holding company's operating subsidiaries (including the insureds of the companies it had acquired) exceeded estimates and outstripped the holding company's capacity to service the claims and its debt.

The reorganization plan for the top U.S. subsidiary resulted in the creation of a Litigation Trust. That Trust was assigned all the causes of action that the U.S. subsidiary owned.

The Litigation Trust then brought this case. The essential premise of its claims is that the majority independent board of the holding company engaged in an imprudent business strategy by acquiring other insurers who had underestimated their potential claims exposure. As a result of that imprudent strategy, the holding company and its top U.S. subsidiary were eventually rendered insolvent, to the detriment of their creditors. Not only that, because the top U.S. subsidiary took on obligations to support its parent's debt and actually assumed some of that debt, the top U.S. subsidiary and its creditors suffered even greater injury than the holding company and its creditors.

Although the complaint is full of inflammatory adjectival assaults on the motives

of the holding company board, they are all of an entirely conclusory and unsupported nature. No pled facts suggest any plausible motive on the part of the holding company's board to cause the company or its top U.S. subsidiary to become insolvent or to dishonor the rights of their creditors. In fact, what the complaint pleads is that the managers and directors of the holding company simply replaced their existing options in the previous public entity, which had been domiciled in Delaware, with identical options in the Bermuda entity resulting from the last acquisition.

Furthermore, although the complaint accuses the board of the holding company of a lack of diligence, it does so by conclusory insult, not by fact pleading. The complaint is entirely devoid of facts indicating that the board did not engage in an appropriate process of diligence before deciding to make its acquisitions and to reorganize its subsidiary structure. Instead, the complaint argues from hindsight, that the fact that the holding company's strategy ultimately failed must mean that the process that led to its adoption was the product of culpably sloppy efforts. Even less does the complaint confront the reality that the holding company directors are immune from liability for breaches of their duty of care, due to the holding company's exculpatory charter provision.

Had this claim been brought by a stockholder of the holding company, it would be easily stopped at the gate, because the complaint fails to plead a breach of fiduciary duty. This is not surprising given that it is unusual for arms-length transactions approved by majority independent boards and a diverse stockholder base to be subject to attack; after all, they are the quintessential transactions subject to the protection of the business judgment rule.

Here, what the Litigation Trust relies upon to make up for its pleading deficien-cies is the later-arising fact of insolvency. But that fact does not aid it.

For one thing, the Litigation Trust has failed to plead facts supporting the inference that either the holding company or its top U.S. subsidiary were insolvent at the time of the transactions challenged in the complaint. For that reason, settled law indicates that the holding company owed no fiduciary duty to the top U.S. subsidiary or that entity's creditors. If the holding company, as controlling stockholder, owed no such duties, it is impossible to fathom how the holding company's directors owed such duties.

Moreover, the mere fact that the holding corporation caused its wholly-owned subsidiary to take on more debt to support the holding corporation's overall business strategy does not buttress a claim. Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created. Parent corporations do not owe such subsidiaries fiduciary duties. That is established Delaware law.

That is not to say that Delaware law leaves the creditors of subsidiaries without rights. That would be inaccurate. Delaware has a potent fraudulent conveyance statute enabling creditors to challenge actions by parent corporations siphoning assets from subsidiaries. And Delaware public policy is strongly supportive of freedom of contract, thereby supporting the primary means by which creditors protect themselves—through the negotiations of toothy contractual provisions securing their right to seize on the assets of the borrowing subsidiary.

What Delaware law does not do is to impose retroactive fiduciary obligations on directors simply because their chosen business strategy did not pan out. That is what the Litigation Trust seeks here, to

**174**

emerge from the wreckage wielding the club that the holding company's own failed subsidiary can now accuse the holding company's directors of a breach of fiduciary duty. To sanction such a bizarre scenario would undermine the wealth-creating utility of the business judgment rule.

As untenable is the Litigation Trust's attempt to hold the former directors of the U.S. subsidiary liable for causing the subsidiary to support the holding company's business strategy. Again, the Litigation Trust fails to plead any facts suggesting a disloyal motive on the part of these former directors. In fact, the motive the Litigation Trust points to does not create an inference that these directors would have wished the subsidiary to become insolvent. Each of them owed his livelihood to the subsidiary. Why would they have wished to put their jobs in jeopardy purposely by hazarding insolvency?

Likewise, the complaint fails to plead facts suggesting that the subsidiary directors were less than diligent or misunderstood their roles. A wholly-owned subsidiary is to be operated for the benefit of its parent. A subsidiary board is entitled to support a parent's business strategy unless it believes pursuit of that strategy will cause the subsidiary to violate its legal obligations. Nor does a subsidiary board have to replicate the deliberative process of its parent's board when taking action in aid of its parent's acquisition strategies.

In the complaint, the Litigation Trust also has attempted to state a claim against the former subsidiary directors for "deepening insolvency." As noted, however, the complaint fails to plead facts supporting an inference that the subsidiary was insolvent before or immediately after the challenged transactions. Equally important, however, is that Delaware law does not recognize this catchy term as a cause of action, because catchy though the term may be, it

does not express a coherent concept. Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery. By doing so, the directors do not become a guarantor of success. Put simply, under Delaware law, "deepening insolvency" is no more of a cause of action when a firm is insolvent than a cause of action for "shallowing profitability" would be when a firm is solvent. Existing equitable causes of action for breach of fiduciary duty, and existing legal causes of action for fraud, fraudulent conveyance, and breach of contract are the appropriate means by which to challenge the actions of boards of insolvent corporations.

Refusal to embrace deepening insolvency as a cause of action is required by settled principles of Delaware law. So, too, is a refusal to extend to creditors a solicitude not given to equityholders. Creditors are better placed than equityholders and other corporate constituencies (think employees) to protect themselves against the risk of firm failure.

The incantation of the word insolvency, or even more amorphously, the words zone of insolvency should not declare open season on corporate fiduciaries. Directors are expected to seek profit for stockholders, even at risk of failure. With the prospect of profit often comes the potential for defeat.

The general rule embraced by Delaware is the sound one. So long as directors are respectful of the corporation's obligation to honor the legal rights of its creditors, they

should be free to pursue in good faith profit for the corporation's equityholders. Even when the firm is insolvent, directors are free to pursue value maximizing strategies, while recognizing that the firm's creditors have become its residual claimants and the advancement of their best interests has become the firm's principal objective.

Along with dismissing the Litigation Trust's fiduciary duty claims and its deepening insolvency claim, I dismiss its claims of fraud. The fraud claims are not pled with appropriate particularity and rest on the general assertion that because the holding company and subsidiary became insolvent nearly three years after the last challenged transaction, the books and records of the companies must have contained knowing misrepresentations of material fact. Because such conclusory allegations do not satisfy Rule 9(b) and for other reasons, the fraud claims are not viable.

Finally, the Litigation Trust advances a host of claims against third-party advisors. Rather than detail what the advisors did that was wrongful, the Litigation Trust devoted much of the complaint to setting forth accusations made against these prominent advisors in other lawsuits. For a myriad of reasons, the claims against these advisors are deficient and will also be dismissed.

I now turn to the facts underlying this case and then to the merits of the motions to dismiss.

## I. Factual Background

### A. The Parties

In 1999, Trenwick Group Inc. operated a specialty insurance and reinsurance organization issuing policies around the world. Trenwick Group Inc., which was a holding company, had five direct subsidiaries at that time and was a publicly-traded corporation. The most important of those subsidiaries for purposes of this case is Trenwick America Corporation ("Trenwick America"), which eventually became a wholly-owned subsidiary of Trenwick Group Inc.'s successor, Trenwick Group Limited. For the sake of clarity, I refer to both Trenwick Group Inc. and Trenwick Group Limited simply as "Trenwick." At all times, Trenwick was the ultimate parent and the company whose shares were publicly listed.

On August 20, 2003, both Trenwick and Trenwick America filed for chapter 11 bankruptcy protection in the U.S. District Court for the District of Delaware.[1] As part of Trenwick America's Plan of Reorganization, the plaintiff Litigation Trust was formed and invested with the right to bring claims belonging to Trenwick America. Exercising that right, on September 20, 2005, the Litigation Trust filed this action.

The defendants in this case can be divided into three general groups: 1) the former directors of Trenwick,[2] the parent corporation; 2) the former directors of Trenwick America;[3] and 3) certain former

1. *In re Trenwick America Corp.*, United States Bankruptcy Court, District of Delaware, Case No. 03–12635 (2003).

2. Defendants serving on the board of directors for Trenwick at various times were: James F. Billett, Jr.; Anthony S. Brown; Richard E. Cole; Robert M. DeMichele; Frank E. Grzelecki; P. Anthony Jacobs; Joseph D. Sargent; Frederick D. Watkins; and Stephen R. Wilcox.

3. Defendants serving on Trenwick America's board of directors were: James F. Billett, Jr.; Stephen H. Binet; Paul Fedsher; Robert A. Giambo; Alan L. Hunte; and James E. Roberts.

advisors of Trenwick.[4]

### B. The History Of The Trenwick Companies Leading Up To This Litigation

#### 1. What Was Trenwick As Of The Beginning Of 1998?

The amended complaint ("complaint") is a confusing muddle, laden with irrelevancies, and failing to set forth a coherent course of events. From the murk of the complaint, and certain public documents it relies upon, I will attempt to craft a more understandable rendition of Trenwick's relevant history.

Critical to that endeavor is establishing a baseline understanding of what Trenwick was before the transactions that the Litigation Trust attacks occurred. As of the beginning of 1998, Trenwick was a specialty insurance underwriting organization. Its shares were listed on the New York Stock Exchange. Trenwick did not have a controlling stockholder or anything close to one.

At that time, Trenwick's principally operated in the domestic United States as a provider of so-called "treaty reinsurance" to American insurers of property and casualty risks.[5] Trenwick conducted this business through an indirect, wholly-owned subsidiary, Trenwick America Re. Trenwick America Re was wholly-owned by a direct, wholly-owned subsidiary of Trenwick called Trenwick America Corporation—that is, "Trenwick America." As of 1997, the business Trenwick conducted through Trenwick America Re was its sole

business, and Trenwick reported assets of almost $1.9 billion, stockholders' equity of almost $358 million, and a book value of $29.93 per share.[6]

#### 2. The 1998 Transaction: Trenwick Expands Into The International Markets By Acquisition

In 1998, Trenwick entered the international insurance markets for the first time. In February of that year, Trenwick acquired Sorema (UK) Limited. Like the existing domestic operations of Trenwick, Sorema's business consisted primarily of underwriting reinsurance. But Sorema also wrote certain specialty insurance policies. Upon acquisition, Trenwick renamed Sorema "Trenwick International Limited." Trenwick International Limited immediately became a major part of Trenwick's overall business.

As of December 31, 1998, Trenwick had assets of almost $ 1.4 billion, stockholders' equity of almost $348 million, and a book value of $31.49 per share.[7]

#### 3. The 1999 Transaction: Trenwick Expands Again Through The Acquisition Of Chartwell

In October 1999, Trenwick consummated another major acquisition. That acquisition is challenged by the Litigation Trust in the complaint and therefore it is important to understand its precise nature.

The entity that Trenwick acquired by merger was Chartwell Re Corporation. Like Trenwick, Chartwell Re was an NYSE-listed company. The total cost of the acquisition to Trenwick was estimated

---

4. The professional advisors named as defendants are Ernst & Young, L.L.P.; PriceWaterhouseCoopers, L.L.C.; Baker & McKenzie, L.L.P.; and Milliman, Inc.

5. Trenwick also sold some so-called facultative reinsurance as of that point, but it was a small portion of its business.

6. Hefter Decl. Ex. G at 10 (Trenwick Form S-4 filed Aug. 23, 2000).

7. Hefter Decl. Ex. G at 10 (Trenwick Form S-4 filed Aug. 23, 2000).

at $368 million, which included the cost of the eight million new Trenwick shares issued to the former Chartwell Re holders as the merger consideration, the assumption of Chartwell Re's debt, and the costs to Chartwell of purchasing $100 million in reserve protection.

The latter issue is raised by the Litigation Trust prominently in the complaint. What it involved was a requirement, demanded by Trenwick, that Chartwell purchase $100 million in reinsurance to protect Trenwick against unanticipated increases in the reserves of Chartwell attributable to business Chartwell wrote before the merger. According to the complaint, the $100 million was exhausted quickly after the merger, as Chartwell's claims exceeded even that excess coverage.[8]

By merging with Chartwell Re, Trenwick acquired several new U.S. and U.K. insurance businesses. The Chartwell insurance businesses were all rated by A.M. Best Company for claims-paying ability at an excellent level and by Standard & Poor's at an A-for claims-paying ability.[9]

In the merger proxy Trenwick issued in connection with the Chartwell merger, it was estimated that after the merger with Chartwell, Trenwick would have assets in excess of $3 billion and that the combined companies' premiums for 1999 would be nearly $900 million, or more than double what Trenwick wrote in 1998 before the

merger.[10] Thus, the acquisition was a major one.

After the merger, Trenwick reorganized itself into four operating units by rationalizing its holding company structure to take into account both the Chartwell and the prior Sorema transaction. The reorganization appears to have occurred primarily along functional and geographic lines.

The principal operating units and their functions thus became:

- Domestic Reinsurance—This unit comprised the domestic reinsurance operations of the company and included both Trenwick's former domestic reinsurance business and the reinsurance business of Chartwell Reinsurance Company. Trenwick America was in this business line. The financials of Trenwick, the parent, aggregated all the business in this line, including those under the Trenwick America name.[11]

- International Reinsurance and Specialty Insurance—This unit sold global reinsurance and specialty reinsurance internationally. Trenwick International was in this business line.

- Chartwell Managing Agents (Management of Lloyd's Syndicates)— This unit was comprised of the Lloyd's syndicates formerly controlled by Chartwell.

- Domestic Specialty Insurance—Canterbury Financial Group, Inc. was

---

8. Compl. ¶ 71.

9. Hefter Decl. Ex. B Ex. 99.2 at 3–4 (Trenwick 8–K filed June 25, 1999).

10. Hefter Decl. Ex. B Ex. 99.2 at 2 (Trenwick 8–K filed June 25, 1999).

11. Trenwick's 10–K is clear that the reinsurance business of Chartwell Reinsurance Company was assumed by Trenwick America and that the 1999 financials of Trenwick America

include the reinsurance business of Chartwell Re and its subsidiaries. *See* Hefter Decl. Ex. A. at 1–2 (Trenwick 10–K filed Aug. 22, 2000). But what is not clear from Trenwick's 10–K is whether the Chartwell Reinsurance Company formally moved to become a subsidiary of Trenwick America or whether Chartwell's reinsurance business was a separate sister company that merely began operating in the same business line as Trenwick America.

the name given to the U.S. specialty insurance businesses acquired from Chartwell. Those businesses, Insurance Corporation of New York and Dakota, were placed as subsidiaries under Canterbury.

As is typical after major merger transactions, Trenwick restructured its debt. Thus, it entered into a $400 million credit facility in November 1999. A $170 million revolving credit facility for the use of Trenwick as a holding company comprised one major chunk of the debt. The other portion, $230 million, went to finance a five-year letter of credit for use by Chartwell Managing Agents in its Lloyd's syndicate underwriting operations. The assets of several Trenwick subsidiaries, including the Trenwick America operating unit entities, were pledged as security for the $400 million debt, thereby rendering Trenwick America a primary guarantor of that debt.

As with the acquisition of Sorema, Trenwick's merger with Chartwell did not involve a transaction with an affiliate. Chartwell was a listed company in its own right and both its stockholders, and the stockholders of Trenwick, voted to approve the merger. In Trenwick's case, 82.8% of the electorate participated in the vote, with over 90% voting to approve the deal.[12] After the closing of the Chartwell acquisition, three members of Chartwell's board joined the Trenwick board increasing the board from one 7/8 comprised of independent directors to one 10/11 comprised of such directors.[13]

As of the end of 1999, Trenwick had reported assets in excess of $3.24 billion, stockholders' equity in excess of a $462 million, and a book value of $27.37 per share.[14]

4. *The 2000 Transaction: Trenwick Grows Again By Merging With Another Public Company, LaSalle Re Holdings Limited*

Beginning in 1998, and continuing in 1999, Trenwick had explored an interest in acquiring yet another publicly-traded insurance company. That company, LaSalle Re Holdings Limited, was a Bermuda entity whose shares traded on the NYSE. The primary business of LaSalle Re was to operate as an underwriter of property catastrophe reinsurance on a worldwide basis. As a secondary line of business, LaSalle Re also wrote certain types of specialty insurance and provided capital support to certain Lloyd's of London syndicates.

After LaSalle finished exploring its options, which included overtures from entities other than Trenwick, it decided to sign a merger agreement with Trenwick. That agreement contemplated that both the Trenwick and the LaSalle common stockholders would become stockholders in a new NYSE-listed entity, Trenwick Group Ltd., which would be domiciled in Bermuda. For each share of their Trenwick and LaSalle shares, stockholders would receive one share in the new Trenwick Group holding company. As a result, the former LaSalle stockholders received a premium to market and would hold a majority of the shares of the resulting entity. The Trenwick stockholders voted to approve the merger on September 25, 2000. As a result of the LaSalle merger, the Trenwick board was increased to fourteen members

---

**12.** Hefter Decl. Ex. C at 23 (Trenwick 10–K filed March 30, 2000).

**13.** Chartwell directors Cole, DeMichele, and Grzelecki joined the Trenwick board. *See* Hefter Decl. Ex. H at 2–5 (Trenwick Proxy Statement filed Apr. 17, 2000); Hefter Decl. Ex. G at 64 (Trenwick Form S–4 filed Aug. 23, 2000).

**14.** Hefter Decl. Ex. G at 10 (Trenwick Form S–4 filed Aug. 23, 2000).

when three former LaSalle directors were added to the board.[15] The board's independent supermajority grew from 10/11 to 13/14.

As the merger proxy issued by Trenwick in connection with the LaSalle deal makes clear, the redomiciliation of the Trenwick public holding company to Bermuda was designed to secure advantageous tax treatment. Moreover, the merger proxy made clear that Trenwick would conduct an internal restructuring of its various subsidiaries before the merger "into three separate groups: a chain of U.S. corporations, a chain of U.K. corporations and a chain of Bermuda corporations."[16] Pages 54 and 55 of the merger proxy were largely devoted to explaining how the U.S. and non-U.S. subsidiaries would be taxed after the merger and the benefits of Trenwick Group's new Bermuda status.

In the merger proxy, Trenwick's financial status as of June 30, 2000 was reported. As of that date, Trenwick had assets of nearly $3.5 billion, stockholders' equity of $439 million, and a book value per common share of $26.98.[17] In the same document, it was reported that "All of Trenwick's principal insurance and reinsurance subsidiaries are rated A (Excellent) by A.M. Best Company, an independent insurance rating organization. Standard & Poor's Rating Services rates the financial strength of Trenwick's principal insurance and reinsurance subsidiaries as A+. Standard & Poor's also rates the Trenwick's counterparty credit and senior debt as BBB+ and its preferred stock as BBB−.

On December 20, 1999, Moody's Investors Service confirmed its previously issued Baa2 rating for Trenwick's senior debt and revised its rating outlook to 'stable.' "[18]

As was also the case in the merger with Chartwell, both of the merger partners received fairness opinions. LaSalle's investment banker estimated the resulting Trenwick entity's value under a discounted cash flow analysis at $17.04 to $23.17 per share without synergies and $19.14 to $25.73 per share with operating synergies from the merger.[19]

This is not to say that the financial statements and information were devoid of less rosey information. They were not. In particular, they plainly revealed that Trenwick operations had suffered operating losses in 1999[20] and Trenwick America operations (including the Chartwell U.S. reinsurance business as of their acquisition) had suffered operating losses in 1999 and 2000.[21]

### 5. The Restructuring Of Trenwick Subsidiaries

Beginning April 1, 2000, Trenwick began a reorganization of its subsidiaries that was completed on September 27, 2000. During the first stage of the restructuring of Trenwick's subsidiaries, Chartwell's reinsurance businesses, including all its active U.S. and U.K. reinsurance subsidiaries were transferred to Trenwick America as indirect subsidiaries. That transfer left Chartwell Re, originally the parent entity of all the Chartwell businesses and the direct subsidiary of Trenwick, holding as

---

**15.** *Id.* at 64. Neither the briefs nor the complaint specify the identity of the former La-Salle directors who joined Trenwick's board.

**16.** *Id.* at 92.

**17.** *Id.* at 10.

**18.** *Id.* at 91–92.

**19.** *Id.* at 47.

**20.** Hefter Decl. Ex. A. at 48, 53 (Trenwick 10–K filed Aug. 22, 2000).

**21.** Stone Aff. Ex. 7 at 5 (Trenwick America Form 10–K filed Apr. 2, 2000).

its only asset one inactive subsidiary. Also at this time, Trenwick America gained as indirect subsidiaries various U.K.-based Chartwell businesses, including Chartwell Managing Agents, which held the Lloyd's syndicates. In sum, with the exception of the Chartwell Re entity itself, all of the former Chartwell businesses were transferred to Trenwick America briefly during the first stage of the restructuring.[22]

In September, the second and third stages of the restructuring occurred. During the second stage, all of the Chartwell U.K. business lines (i.e., reinsurance and Lloyd's) that were transferred into Trenwick America in April were transferred out of Trenwick America to another principal operating subsidiary known as Trenwick Holdings Limited, which held only U.K.-based businesses, including Trenwick International. That is, Trenwick America was left primarily holding the U.S.-based reinsurance and specialty insurance businesses while Trenwick Holdings Limited was left holding all the UK-based businesses, regardless of the type of insurance business. Also, during the second stage, Trenwick contributed all of its assets and liabilities to Chartwell Re except for the $135 million intercompany payable it was owed by Chartwell Re. Trenwick's liabilities that were transferred included approximately $75 million in senior notes, approximately $113.4 million in subordinated deferrable interest debentures, and an additional $1 million in contingent interest notes that came from Chartwell during the 1999 merger (collectively, the "Assumed Notes"). The structural impact of this transfer of all or substantially all of Trenwick's assets was that Chartwell Re remained as the only direct subsidiary of Trenwick while Trenwick America and Trenwick Holdings became subsidiaries of Chartwell Re.

Finally, during the third stage of the restructuring of subsidiaries, which occurred the same day as the second stage, Chartwell Re sold back all the U.K. subsidiaries it had received in the second stage of the restructuring to Trenwick (i.e., the ultimate parent and publicly-listed entity) in exchange for reducing the $135 million intercompany held by Trenwick and owed by Chartwell Re. Thus, all the U.K. and foreign businesses were again wholly-owned subsidiaries of parent Trenwick while the U.S. businesses held in Trenwick America remained the only subsidiaries of Chartwell Re.

### 6. The LaSalle Combination And The Creation Of Trenwick Group Limited

The day after Trenwick restructured its subsidiaries, September 27, 2000, LaSalle and Trenwick merged. They merged into a newly-created entity named Trenwick Group Limited. Chartwell Re then merged with and into its subsidiary Trenwick America bringing to Trenwick America Chartwell Re's only other subsidiary, which was inactive. Thus, when Chartwell Re merged into Trenwick America, Trenwick America became responsible for the liabilities Chartwell Re had received from Trenwick (including the approximately $190 million in Assumed Notes) when Trenwick had transferred substantially all its assets to Chartwell Re in the second stage of the internal restructuring.

To summarize, before the restructuring began, Trenwick America consisted of only the Trenwick America domestic reinsur-

---

22. As previously noted, *supra* note 11, the reinsurance business of Chartwell may have been part of or a subsidiary of Trenwick America previous to this stage. At the least, they were operated together as a business line and the financial results were reported together.

ance business and (at least operationally) the reinsurance business of Chartwell. But by the end of the internal corporate restructuring and the completion of the LaSalle merger, Trenwick America was the branch of Trenwick with all the U.S. businesses and entities, regardless of the specific business line in which they operated and whether the entities were acquired in the Chartwell or LaSalle acquisitions. In addition to gaining all the remaining U.S. businesses, by the end of the restructuring and the LaSalle merger, Trenwick America also held additional debt—the Assumed Notes—that was initially incurred by parent Trenwick. Trenwick America, therefore, gained both new assets and liabilities by the end of September 2000.

As described, the LaSalle and Trenwick merger resulted in Trenwick Group Limited. The Trenwick shareholders approved Trenwick Group Inc.'s dissolution, and accordingly, Trenwick's board of directors filed a certificate of dissolution with the Delaware Secretary of State on September 26, 2000. Shortly after the LaSalle merger, the credit facility originally set up for the Chartwell acquisition was amended and increased to $490 million from the original $400 million.[23] The implications of that amended credit facility are discussed in the next section.

## II. *The Complaint And Procedural Background*

Regrettably, I must now take the reader back through this chronology, tracking through it in a manner that identifies the aspects of the preceding course of events that the Litigation Trust challenges. Normally there would be no need for this sequential exercise. In this case, it is unavoidable because the complaint fails to articulate a coherent narrative.

### A. *The Chartwell Transaction*

In chronological order, the complaint first challenges the Chartwell transaction. The allegations involving the Chartwell transaction are cursory. Essentially they involve the notion that it was a dumb business decision for Trenwick to merge with Chartwell. Specifically, the complaint alleges that:

- *Chartwell turned out to be in worse shape than Trenwick estimated and ran through the $100 million adverse development policy purchased in connection with the merger within a year after the merger:* In this connection, the complaint alleges that Trenwick conducted "due diligence" on Chartwell, including receiving an actuarial analysis by defendant Milliman, Inc., a well-known actuarial firm. That due diligence stimulated the requirement that Chartwell buy the $100 million coverage;

- *Trenwick entered into the $400 million credit facility after the Chartwell purchase:* In connection with that, Trenwick caused its Trenwick America subsidiary (which conducted its American reinsurance operations) to pledge its assets as security for the credit facility. The key Chartwell subsidiary's assets were already pledged, but the Litigation Trust complains that its assets were also pledged to cover its own debt and that Trenwick America was therefore the most likely entity to have to make good on a default by parent Trenwick under the credit facility. According to the Litigation Trust,

---

**23.** Compl. ¶ 84. The credit facility retained the $230 million letter of credit, but the revolver increased to $260 million.

Trenwick America derived no benefit from the pledge or the Chartwell transaction. This allegation, of course, ignores the fact that the stock of Trenwick America was wholly-owned by Trenwick, which had decided that the Chartwell acquisition was good for Trenwick.

- *Touted the Chartwell merger as a success when it was not:* Despite the fact that the losses at Chartwell exceeded the $100 million policy, Trenwick claimed in an amended 10–K in August 2000 that the "acquisition of Chartwell provided Trenwick with additional cost-effective means of augmenting capital, accelerating premium growth and added structural platforms for expansion." [24] Trenwick also estimated that it would achieve operating synergies as a result of the Chartwell merger of between $15–25 million in 2000 and 2001, respectively. Because of the problems that Chartwell was already experiencing as of that time, the Litigation Trust says that the Trenwick directors must have known those claims were untrue.

- *Trenwick America was insolvent before and after the Chartwell merger:* The complaint alleges, without factual support, that Trenwick America was "insolvent" before Chartwell was acquired and after it was acquired. When I say without factual support, I mean that nothing in the complaint supports the assertion. Nothing.[25]

B. *The LaSalle Merger And Corporate Reorganization*

The complaint then challenges the reorganization of Trenwick's business lines in connection with the LaSalle merger and Trenwick's redomiciliation in Bermuda. As explained in the previous section, the internal reorganization and LaSalle merger resulted in a corporate structure in which Trenwick had: (1) a chain of Bermuda subsidiaries; (2) a chain of American subsidiaries; and (3) a chain of U.K. subsidiaries.

On this score, the complaint achieves a level of obscurity and incomprehensibility that is truly remarkable. Describing the reorganization tritely as a "three card monte," [26] the complaint then goes on to explain the reorganization in an unfathomable manner. Here is my best attempt to articulate what it is about the reorganization that offends the Litigation Trust.

First and foremost, the Litigation Trust contends that the reorganization was undertaken for the benefit of Trenwick, as a public holding company, and "without regard to the best interests of the [Trenwick America] stockholders." [27] This, of course, is internally inconsistent. Trenwick owned all of the equity of Trenwick America. Therefore, if the reorganization was in the best interests of Trenwick and its stockholders, it was in the best interests of Trenwick America's equity owners.

What is critical therefore is to figure out how some other constituency of Trenwick America was somehow injured by the reorganization. As of the beginning of the restructuring, we know that the Litigation Trust is upset that Trenwick America's assets have been pledged as security for the $400 million credit facility Trenwick procured. In other words, even though Trenwick America did not own, for exam-

---

24. *Id.* ¶ 72.

25. *Id.* ¶ 98.

26. *Id.* ¶ 74.

27. *Id.* ¶ 75.

ple, the Chartwell Managing Agents business (to which $230 million of the credit facility was dedicated) or the Trenwick International line of businesses (for which the remaining $170 million revolving facility could be used at Trenwick's discretion), Trenwick America was on the hook for the full $400 million if Trenwick defaulted. That is a given at the get-go, or *ab initio*, as some Latin lovers might prefer.

Before the internal reorganization began in March 2000, Trenwick America is at the top of a chain of subsidiaries comprising only its own U.S. reinsurance businesses, such as Trenwick America Reinsurance Corporation, and Chartwell's U.S. reinsurance businesses.[28] By the end of the reorganization on September 27, 2000, Trenwick America's position is only slightly different from what it was at the get-go. Under Trenwick America were the following additional business lines: the U.S. specialty insurance businesses previously held under Canterbury, and an inactive subsidiary called Drayton Company Limited.

In other words, Trenwick America went from being the key entity in one business line comprised of domestic reinsurance operations for both Trenwick and Chartwell to being the parent of all the U.S. corporations in that line. The ownership of these entities is not really what the complaint challenges, it is the increase in Trenwick America's debt that resulted from the reorganization. I describe that next.

Concurrently with the merger of Trenwick and LaSalle, a new credit facility was entered for $490 million, a figure $90 million higher than the previous figure. Of the $490 million, $230 million was for a letter of credit dedicated to the Lloyd's

syndicates managed by Chartwell Managing Agents. Before the restructuring and LaSalle merger, Trenwick America had been on the hook for this portion of the credit facility in the event parent Trenwick defaulted. After the LaSalle merger, the primary obligor on the $230 million letter of credit became Trenwick Holdings Limited, that is, the top U.K. subsidiary, which was on top of all the Trenwick subsidiaries conducting business out of the U.K. Trenwick America remained a guarantor, however, of that letter of credit. The remaining $260 million of the credit facility was for a revolver. After the LaSalle merger, Trenwick America went from being the secondary obligor to becoming the primary obligor for that part of the facility. According to the Litigation Trust, the revolver had no benefit for Trenwick America but simply was necessary for Trenwick's other operations. Thus, Trenwick America's liability exposure under the credit facility increased after the restructuring and LaSalle merger. That exposure was in addition to the obligation to service $190 million in Assumed Notes by Trenwick America that previously was owed by parent Trenwick.

Trenwick America's 10–K filed in April 2001 reflected those changes, reporting that at year end Trenwick America had approximately $367 million in indebtedness. That debt was compromised of approximately $181 million in revolving loans outstanding at that time, $75 million in senior notes, $1 million in contingent interest notes, and $110 million in preferred securities.[29] According to the 10–K, that was an increase of approximately $46 mil-

---

**28.** As previously noted, Trenwick America may have assumed, within its business line, the operational responsibility for the business of Chartwell Reinsurance Company without having formally acquired that Chartwell entity or its subsidiaries. *See supra* note 11.

**29.** *See* Stone Aff. Ex. 7 at F–17–F–18 (Trenwick America 10–K filed Apr. 2, 2001).

lion from the previous year.[30]

In a conclusory manner unsupported by pled facts, the complaint alleges that Trenwick America was insolvent after the reorganization. For example, the complaint alleges that the reorganization reduced the book value of Trenwick America from $565 million to $204 million because of the debt Trenwick had guaranteed.[31] Of course, $204 million in positive value is a long way from insolvency. But the complaint fills this gap through this conclusory paragraph:

> On the books, [Trenwick America] appeared to be solvent. However, the public records did not give a true picture of the state of [Trenwick America's] affairs. Instead, the [Trenwick America] Defendants and [Trenwick] Defendants and [Trenwick Group Limited] wrongfully hid the fact of [Trenwick America's] insolvency through "creative accounting," assisted by E & Y and PWC. To any objective observer, with access to its true books and records, [Trenwick America's] assets were worth far less than its liabilities. In fact, its adjusted equity value after the reorganization was hundreds of millions of dollars in the red.[32]

Absent from this paragraph are any real facts. Remarkably, the complaint entirely fails to address the reality that LaSalle was a public company not controlled by Trenwick. LaSalle and Trenwick merged in a stock-for-stock merger. Each side had financial advisors and each side's stockholders approved the merger. The reality that the financial markets believed each company had positive economic value and that the resulting Trenwick has positive value is ignored in the complaint.

## C. The Allegations That Trenwick's Directors And Officers Somehow Enriched Themselves By The Chartwell And LaSalle Transactions

At all relevant times, the Trenwick board was comprised almost entirely of directors who were not officers of Trenwick. Only one of the Trenwick directors was an executive, James F. Billett, Jr. Although the complaint does not bother to identify his title, Billett was the CEO of Trenwick during the period when the challenged transactions occurred.

The complaint's allegations regarding the incentives of the Trenwick directors, frankly, make no economic sense. The complaint alleges that the Trenwick directors entered into the Chartwell and LaSalle mergers in order to enrich themselves but in a way that somehow "had nothing to do with earning a profit for shareholders or timely paying creditors, and everything to do with bonuses, gold parachutes, ego, and greed."[33]

This inflammatory, albeit banal, rhetoric is unaccompanied by pled facts supporting the assertion. At most, the complaint alleges that as part of the LaSalle acquisition, the Trenwick directors "received bonuses and stock (and cash in lieu of fractional shares) in the newly-formed" Bermuda holding company for their preexisting options and equity in the former holding company.[34] This exchange somehow is alleged to have "provided a financial benefit" to the Trenwick directors "beyond that enjoyed by the other shareholders of the corporation."[35]

---

30. *Id.*

31. Compl. ¶ 89.

32. *Id.* ¶ 90.

33. *Id.* ¶ 35.

34. *Id.* ¶ 85.

35. *Id.*

At most, this allegation suggests that the Trenwick directors received treatment equivalent to that of other equityholders. When the new Bermuda holding corporation was formed it was to become the publicly-listed company. Thus, in order for option holders to retain their pre-existing value, they had to receive options to buy stock in the new listed company. The receipt of such replacement options presents no conflict, in itself.

As important, that the Trenwick directors received options is at odds with the notion that they believed they were taking steps that would lead to the insolvency of Trenwick. If Trenwick became insolvent, the options would have no value.

As to the bonus compensation, the complaint fails to provide any specifics. The Litigation Trust had access to Trenwick's books and records. The public filings it references in the complaint do not indicate that any bonus compensation was to be paid to the independent directors of Trenwick as a result of the LaSalle acquisition or that Billett's severance agreement was triggered in a manner that gave him a right to payments. In connection with the Chartwell acquisition, there is a disclosure that Billett received a bonus for his work on the transaction as CEO, but that the company had cut the bonus pool for the succeeding year from which Billett and other executives could potentially benefit.[36] There is no indication that the outside directors of Trenwick received bonuses.

The complaint is just as obscure when it alleges that the directors of Trenwick America were somehow conflicted. As one would expect, the Litigation Trust is able to allege that most of the directors of Trenwick America were employees of Trenwick and Trenwick America. This would be natural given that Trenwick America was a wholly-owned subsidiary.

The directors of Trenwick America are alleged to have received options in the new Bermuda holding company after the LaSalle merger. That is a wholly innocuous fact. Moreover, these directors are alleged to have gotten bonuses. As executives, one would expect that they might get bonuses. Nothing in the complaint alleges that the bonuses were not determined at the Trenwick level—where the board was overwhelmingly independent—and nothing in the complaint alleges that the bonuses were out of order. Furthermore, the complaint makes one assertion that was likely true, which is that the executives who served on the Trenwick America board owed their livelihood to Trenwick. That assertion, however, would (as would the grant of options in the new Bermuda entity) give those executives a strong interest in maintaining Trenwick as a solvent entity capable of employing and paying them. Notably, the public disclosures of Trenwick indicated, as I just mentioned, that the bonus pool for executives for the years 2000 and 2001 had been trimmed in the wake of the Chartwell acquisition.

All in all, the complaint essentially concedes that the Chartwell and LaSalle acquisitions, and the reorganization of Trenwick, were overseen by a parent board with only one management director, Billett. That management director is not alleged to have received excessive compensation, and he and other officers and directors simply received replacement options in the new publicly-listed holding company that replaced the options they held in the former publicly-listed holding company.

D. *Trenwick Falls Into Financial Distress In 2002 And 2003*

This case is before the court because something bad happened. The bad here

---

36. Hefter Decl. Ex. H at 14 (Trenwick Proxy Statement filed Apr. 17, 2000); Hefter Decl. Ex. I at 27 (Trenwick Proxy Statement filed Apr. 12, 2002).

was that Trenwick eventually faltered as an entity. Both the public holding company Trenwick and Trenwick America filed for bankruptcy in August 2003.

The complaint's allegations regarding the circumstances giving rise to the bankruptcy filing are sparse. In a paragraph, the complaint tersely indicates that by the end of 2001, Trenwick America was "substantially under-reserved" despite not having material exposure to losses caused by the September 11, 2001 terrorist attacks.[37] In 2002, Milliman is alleged to have conducted an analysis revealing that Trenwick America remained unreserved. Allegedly, Trenwick did not disclose that results of that analysis.[38]

During the same year, Trenwick allegedly caused Trenwick America to pay increased fees on the $230 million portion of the credit facility that supported the Lloyd's syndicates, "despite the fact that [Trenwick America] was still neither a party to nor a beneficiary of that letter of credit." [39]

On April 1, 2003, Trenwick America allegedly announced that it could not file its 10–K in a timely fashion, because "management's time and attention during the past several months has been principally devoted to issues arising as a result of the significant deterioration in the financial condition of Trenwick Group Limited ("Trenwick"), the Company's parent, including efforts to restructure Trenwick's outstanding indebtedness." [40]

Eventually, the complaint alleges, Trenwick America failed because of the liabilities it assumed in 2000 at the end of the LaSalle merger and the corporate reorganization. The complaint is not more specific than that. I take it that means that because Trenwick could not service the $490 million credit facility itself, the lenders under that facility were entitled to look to the assets of Trenwick America to make good on that obligation, and that Trenwick America could not do that and service the Assumed Notes. Relatedly, I infer that the insurance operations that Trenwick acquired from Chartwell turned out to be more problematic than profitable, because Chartwell had to pay out more in claims than was estimated and was unable to overcome that through growth in profitable new sales.

### E. The Alleged Fraud

At the tail end of its complaint, the Litigation Trust alleges that the Trenwick and Trenwick America directors committed fraud, in concert with each other and with outside advisors to Trenwick. The fraud alleged consists of non-disclosures and material misstatements of fact.

The allegedly material facts that were wrongly concealed were:

- Trenwick America's financial condition from 2000 through 2003; [41]

- The financial condition and reserve-level problems at Chartwell before its acquisition by Trenwick in 1999; [42]

- The "true nature of the intercompany payable supposedly due to [Trenwick] by [Chartwell];" [43]

---

37. Compl. ¶ 91.

38. *Id.*

39. *Id.* at ¶ 92.

40. *Id.* at ¶ 93 (Trenwick America Notification of Inability to Timely File Form 10–K filed Apr. 1, 2003).

41. *Id.* ¶¶ 125, 131.

42. *Id.*

43. *Id.*

- The "actual value of the LaSalle transaction;"[44] and
- The "true value of the various [Trenwick] subsidiaries transferred between companies in the 2000 transaction."[45]

The complaint alleges that the Trenwick and Trenwick America officers and directors had a duty to disclose these facts to "Plaintiff."[46] By that, I suppose the Litigation Trust means the entity whose claims it now possesses, Trenwick America. Supposedly, Trenwick America relied to its detriment on the omission of information regarding these matters.[47]

The complaint then alleges material misstatements of fact that were made in August 2000 by the Trenwick directors in the LaSalle merger proxy:

- A supposed statement that the Chartwell merger had been "beneficial and was expected to result in cost savings;"[48]
- An overstatement of the "amount of intercompany loans given by" Trenwick;[49]
- A claim that the "LaSalle acquisition would make Trenwick more competitive in all of its major markets;"[50]

Allegedly, the Trenwick directors knew "these statements were false when made." Again, "Plaintiff"—i.e., Trenwick America—supposedly relied detrimentally on the statement.[51]

### F. The Causes Of Action In The Complaint

The complaint sets forth eight counts. All center on one idea: Trenwick's strategy of growing by acquiring Chartwell and LaSalle was "irrational" and resulted from "gross negligence."[52] As a result of stupidity, the Trenwick directors, whose bidding was followed by the Trenwick America directors, put together a large insurance holding company with inadequate reserves and assets to cover the claims that were ultimately made against it. By pledging the assets of Trenwick America to cover the debt resulting from this expansion strategy, the Trenwick and Trenwick America directors injured Trenwick America by rendering it insolvent and leaving it with too few assets to satisfy its creditors. To carry out this feckless plan, Trenwick employed the defendant advisors, who provided intentionally erroneous or at least negligent advice that facilitated the implementation of a foolish business strategy, which ultimately worked harm to Trenwick America as an entity and its creditors.

As a matter of characterization of claims, the Litigation Trust alleges that the Trenwick directors breached their fiduciary duties of care and loyalty by this conduct—duties that the Litigation Trust alleges were owed to the creditors of Trenwick and its subsidiaries because Trenwick and its subsidiaries were insolvent. As a component of this breach, the Trenwick directors supposedly engaged in fraud by concealing and misstating the facts regarding the nature and effects of the expansion strategy.

The Trenwick America directors are accused of identical conduct and conspiring

44. *Id.*

45. *Id.*

46. *Id.* ¶ 126.

47. *Id.* at 127.

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

52. *Id.* ¶ 100.

with the Trenwick directors. As to them, however, the Litigation Trust makes the argument that they faced a conflict the Trenwick directors did not—a conflict among the constituencies of Trenwick America. That is, the Trenwick America directors are alleged to have injured the creditors of Trenwick America by causing its assets to be pledged to support other subsidiaries owned by Trenwick, at a time when Trenwick America was insolvent. For that reason, the Trenwick America directors are alleged to have violated their fiduciary duties, because the focus of the Trenwick America board had to be solely upon making sure Trenwick America could satisfy as many of the legal claims of its creditors as possible, with the equity owner and parent, Trenwick, being out of the picture as a result of its corporate child's insolvency. In addition, the Trenwick America directors are accused in a separate count of the supposed tort of "deepening insolvency" by coloring the entity and its subsidiaries an even deeper shade of red by increasing their debt in connection with the LaSalle acquisition.

Finally, the defendant professional advisors (the "defendant advisors") are charged with conspiring with the Trenwick and Trenwick America directors and, redundantly, of aiding and abetting their breaches of fiduciary duty and fraud. These advisors also are accused of professional malpractice for failing to protect Trenwick America, the corporate child, from harm in the advisors' capacity as advisors for Trenwick, the parent.

### G. *The Current Motions Before The Court*

All of the defendants have moved to dismiss the complaint, primarily for failure to state a claim. The standard of review that applies on a motion to dismiss under Rule 12(b)(6) is familiar. All inferences from well-pled allegations of fact in the complaint must be construed in favor of the plaintiff,[53] but the court should not give weight to conclusory allegations not grounded in allegations of fact.[54] In evaluating the complaint, the court may also consider the unambiguous terms of those documents incorporated by reference in the complaint, especially when evaluating a claim that those documents make material misstatements of fact.[55] Here, although the complaint cites specifically Trenwick's 1999 annual report, it also liberally refers to the "public records," [56] and the "books" of Trenwick and Trenwick America.[57]

In this case, it was critical for me to review those documents simply to be able to have any understanding of the Litigation Trust's claims in the complaint. To state a claim, a plaintiff ought to have to articulate a story that is comprehensible. Here, that was not done. In order to ensure fairness to the Litigation Trust, as

---

**53.** *E.g., Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099, 1104 (Del.1985).

**54.** *E.g., In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993).

**55.** *E.g., In re General Motors S'holder Litig.,* 897 A.2d 162, 169 (Del.2006) (explaining that in limited circumstances courts may consider the plain terms of documents incorporated in the complaint without thereby converting the motion into one for summary judgment); *In re Santa Fe,* 669 A.2d 59, 69 (Del.1995); *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727

(Del.Ch.1999); *Sanders v. Devine,* 1997 WL 599539, at *4 (Del.Ch. Sept.24, 1997); *see also H–M Wexford, LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del.Ch.2003) ("a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.").

**56.** *E.g.,* Comp. ¶ 90.

**57.** *Id.*

well as the defendants, I reviewed the disclosures incorporated in the complaint so that I could establish a coherent framework for the evaluation of the complaint.[58] That review does not involve the consideration of a competing version of events, but simply of context that enabled me to understand the Litigation Trust's assertions. To that point, it also is evident that the Litigation Trust relied heavily on these referenced documents in crafting the complaint, and has drawn its own, less than clear, recitation of the facts from them. In the end, I do not draw any facts from them that contradict the facts pled in the complaint, but the documents admittedly make the cursory nature of the complaint and its failure to plead facts, rather than conclusory allegations, more patent.

## III. *Legal Analysis*

With the factual background and procedural framework in mind, I now turn to an evaluation of the viability of the complaint. That evaluation will proceed in this order.

Initially, I will consider exactly whose claims the Litigation Trust may press in this litigation. Once I do that, I will consider whether the Litigation Trust has stated a claim for breach of fiduciary duty against the Trenwick and Trenwick America directors. Then, I will determine whether Delaware law recognizes as an independent cause of action an assertion that fiduciaries "deepened" the insolvency of an entity. After that, I will address the viability of the fraud claims brought against the Trenwick and Trenwick America directors. Finally, I will address the claims brought against the defendants who were Trenwick advisors.

## A. *The Litigation Trust Lacks Standing To Pursue Claims On Behalf Of Trenwick America's Creditors*

■ As a creature of statute and Trenwick America's chapter 11 plan of reorganization, the Litigation Trust is entrusted with standing to pursue only certain defined "Causes of Action." [59] But the Litigation Trust conceives its standing to be more expansive than the defendants interpret it to be under federal bankruptcy law and Trenwick America's governing reorganization plan. The Litigation Trust contends that, under the terms of Trenwick America's plan of reorganization, the Trust has standing to pursue claims on behalf of Trenwick America's creditors in addition to any claims Trenwick America had before the filing of its bankruptcy petition. The defendants agree that the Trust has standing to bring any claims Trenwick America holds, but the defendants disagree that the Trust has standing to pursue claims on behalf of Trenwick America's creditors. I find that the defendants are correct that the Litigation Trust does not have standing to pursue the claims of Trenwick America's creditors under either the governing bankruptcy documents or under federal bankruptcy law.

Trenwick America's chapter 11 reorganization plan states specifically that the vested "Causes of Action" are:

> *any and all claims,* suits, rights, *actions, causes of action,* recoveries, and *judgments that could have been brought by or on behalf of the Estate or Debtor in Possession arising before,* on or after the Petition date, known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity or any theory

---

58. *See, e.g., Solomon v. Armstrong,* 747 A.2d 1098, 1121 n. 72 (Del.Ch.1999) ("[I]t is well settled that where certain facts are not specifically alleged (or in dispute) a Court may take judicial notice of facts publicly available in filings with the SEC.") (citations omitted).

59. TAC Second Amended Plan of Reorganization § 6.03; Litigation Trust Agreement § 1.1.

of law liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether filed or initiated prior to the Confirmation Date . . . or afterward, *including,* but not limited to . . . (ii) *those that belonged to the Debtor prior to the Petition Date,* (iii) those on behalf of the Estate's creditors, (iv) those of the Estate or Debtor in Possession may have against any Person arising under chapter 5 of the Bankruptcy Code, or any similar provision of state law or any other law, rule regulation, decree, order, statute or otherwise, *(v) those claims, rights, suits, judgments, causes of action, and/or judgments, recoveries or proceeds therefrom that may be assigned by the holders thereof to the Estate, Debtor in Possession or the Litigation Trust,* (vi) *derivative creditor and shareholder claims* and (vii) right of setoff or recoupment, and claims on contracts or breaches of duty imposed by law. . . . [60]

Under this definition and the Litigation Trust Agreement, the Litigation Trust contends that it has the authority to bring the claims of Trenwick America's creditors. But the relevant provisions of those governing documents do not support the Litigation Trust's position.

First, although the definition of "Causes of Action" contemplates the possibility of assignment of creditors' claims to the Litigation Trust, no automatic assignment of such claims arises from this definition or elsewhere in the plan of reorganization. At most, the definition of "Causes of Action," included in the court-approved plan of reorganization, merely contemplates the possibility that creditors may assign their direct claims to the Trust. The only creditor claims that are automatically vested in

the Litigation Trust are in fact not creditor claims at all. They are "derivative creditor and shareholder claims" brought on behalf of Trenwick America. That the Litigation Trust's reading is incorrect also is evidenced by certain provisions of the Litigation Trust Agreement, which include an express assignment of Trenwick America's pre-petition claims to the Litigation Trust, but not the claims of Trenwick America's creditors.

Section 3.2.3 of the Litigation Trust Agreement also provides that the Managing Trustee for the Trust is authorized to "accept the assignment or transfer of claims, rights, suits, judgments, causes of action . . . from the holders thereof. . . ." [61] That is, the Litigation Trust Agreement putatively gives the Trust the ability to pursue claims not belonging to Trenwick America where there was an express assignment of claims. In this case, the only express assignment of claims in section 1.4 of the Litigation Trust Agreement. That section reads:

> Assignment and Assumption of Liabilities: In accordance with Sections 1.2 and 1.3 hereof, [Trenwick America and Trenwick America's successor] hereby transfers and assigns, and the Managing Trustee on behalf of the Litigation Trust, hereby assumes and agrees that all Litigation Trust Claims *will be and hereby are transferred* to the Litigation Trust subject to any liabilities provided for in the Plan.[62]

Thus, under section 1.4, only the pre-petition claims of Trenwick America (i.e., Trenwick America's derivative claims) were expressly assigned to the Litigation Trust. No other express assignment of

---

60. TAC Second Amended Plan of Reorganization § 1.16 (emphasis added).

61. Litigation Trust Agreement § 3.2.3.

62. *Id.* at § 1.4 (emphasis added).

claims is made in that section or any other section of the Litigation Trust Agreement.

In addition, even if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of Trenwick America's creditors to the Litigation Trust, federal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors. In *Caplin v. Marine Midland Grace Trust Co.,*[63] the U.S. Supreme Court established that bankruptcy trustees and litigation trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute.[64] The U.S. Supreme Court explained that the bankruptcy statute authorized bankruptcy trustees or litigation trusts to bring only those claims belonging to the *debtor* at the time of the debtor's bankruptcy filing, but that it did not vest with trustees or litigation trusts standing to pursue separate claims belonging to others, such as the direct claims of individual creditors. The rule articulated in *Caplin* holds true even in cases where a creditor has assigned her claims to a trustee or Trust,[65] which is not the situation here.

For all the reasons described, the Litigation Trust therefore lacks standing to pursue direct claims on behalf of Trenwick America's creditors. Therefore, the Litigation Trust's complaint must be analyzed solely from the perspective of whether it pleads viable claims belonging to Trenwick America itself as an entity.

## B. *The Litigation Trust Fails To State A Claim Against The Former Directors Of Trenwick*

█ Analytical clarity is served by first examining the Litigation Trust's claim that the Trenwick board of directors breached its fiduciary duties by approving the Chartwell and LaSalle mergers and the reorganization of Trenwick. That claim is a quite unusual one.

. █ Remember that the Litigation Trust only has the ability to assert a claim that Trenwick America possesses. Therefore, this claim depends on the notion that the directors of a corporate parent—Trenwick—breached fiduciary duties owed to the parent's wholly-owned subsidiary—Trenwick America. But that notion is at odds with our state's law. Under settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or their credi-

**63.** 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

**64.** Although the U.S. Supreme Court decided *Caplin* under the Bankruptcy Act, the adoption of the U.S. Bankruptcy Code, 11 U.S.C. § 101 et. seq., did not alter the rule articulated in *Caplin*. *See Williams v. Cal. 1st Bank,* 859 F.2d 664, 666 (9th Cir.1988) ("*Caplin* remains the law under the revised bankruptcy code."); *Ozark Rest. Equip. Co., Inc. v. Anderson (In re Ozark Rest. Equip. Co.),* 816 F.2d 1222, 1227–28 (8th Cir.1987) ("No trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee ... has power ... under the Code to assert general causes of action ... on behalf of the bankrupt estate's creditors."). The federal courts continue to rely on *Caplin*. *E.g., Fla. Dep't of Ins. v. Chase Bank of Texas Nat'l Assoc.,* 274 F.3d 924, 929 (5th Cir.2001), *cert. denied,* 535 U.S. 1097, 122 S.Ct. 2294, 152 L.Ed.2d 1052 (2002) (citing *Caplin*); *Steinberg v. Buczynski,* 40 F.3d 890, 892 (7th Cir.1994); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991).

**65.** *See In re Bennett Funding Group, Inc.,* 336 F.3d 94 (2d Cir.2003) (explaining that the assignment of creditors' claims did not confer standing on the trustee); *Williams,* 859 F.2d at 666–67 (holding that the trustee could not bring claims of creditors although the creditors had assigned the claims); *In re Gaudette,* 241 B.R. 491, 499–502 (Bankr.D.N.H.1999).

tors.[66]

Assume for a moment that Trenwick itself never went bankrupt. Imagine further that it had bought another insurer and pledged a key asset of Trenwick America as security for the purchase price. The purchase goes wrong and causes Trenwick to become less profitable, but not insolvent. To satisfy its creditors, Trenwick causes Trenwick America to sell the key pledged asset and uses the proceeds to pay off the acquisition debt. As a result, Trenwick America is less profitable and less valuable. In this scenario, even though the course of events posed no prospect of benefit for Trenwick America when it is conceived solely as an entity, there would be nothing troubling about it from a fiduciary perspective. Rather, the scenario would involve a garden-variety situation when a parent corporation used the asset value of one of its wholly-owned subsidiaries to help it finance and absorb the downside of the parent's larger business strategy.

The case before me now does not present a materially different situation, and is complicated only by the reality that both the corporate parent and the corporate child went into bankruptcy, leaving their creditors with less than 100 cents on the dollar. The question is whether, on the facts as pled, this distinction supports recognition of a cause of action on the subsidiary's part against the directors of the parent. For the following reasons, I conclude not.

I begin with the reality that if the complaint was filed on behalf of Trenwick itself, it would fail to state a claim for breach of fiduciary duty. Trenwick's Delaware charter contained an exculpatory charter provision under § 102(b)(7) before the LaSalle merger, and a similar provision carried forward in the charter of the resulting Bermudan public holding company. As a result, neither Trenwick nor its stockholders could bring an action against its directors for damages resulting from a breach of duty of care.

Here, I do not believe that the complaint even pleads facts supporting a gross negligence claim. It is undisputed that the Trenwick board was dominated by independent directors. The complaint pleads no facts indicating that they had a motive to injure Trenwick. Even as to the one management director, defendant James Billett, the complaint alleges no facts suggesting a motive on his part to injure Trenwick's long-term value. Indeed, the complaint indicates that Billett rolled his existing options into options in the entity resulting after the LaSalle merger.

■ Moreover, both the Chartwell and LaSalle mergers involved stock-for-stock mergers between Trenwick and independent public entities. These were not self-dealing mergers and they received support from Trenwick's diverse base of shareholders. Whether or not the mergers turned out well, there is nothing in the complaint that supports the notion that the idea of putting these businesses together in order to achieve economies of scale and a larger market share was irrational. Under our law, a complaint does not state a claim simply by alleging in a cursory manner that independent directors pursued "an all consuming and foolhardy acquisition strat-

66. *E.g., Anadarko Petro. Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del. 1988). Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders. *See* David A. Drexler, Lewis S. Black, Jr., & A. Gilchrist Sparks, III, Delaware Corp. Law And Practice § 15.11, at 15–72 (2002).

egy."[67] As Chancellor Allen noted in *Gagliardi*:

> [T]o allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in good faith pursuit of corporate purposes, does not state a claim for relief ... no matter how foolish the investment may appear in retrospect.[68]

Nor does the complaint even attempt to plead deficiencies in the deliberative process that the Trenwick board used to evaluate these mergers. At most, the complaint points out that Trenwick's due diligence identified that Chartwell's reserves might not be adequate and that a $100 million insurance policy was procured to address that risk. Although the complaint alleges that the $100 million turned out to not be enough, the reality is that this part of the complaint indicates that Trenwick in fact conducted due diligence and obtained $100 million worth of coverage to address a material risk. That coverage turned out to be inadequate does nothing to suggest that the Trenwick board acted outside its exculpatory immunity. This sort of quibble does not, in my view, even raise a due care claim without the pleading of facts suggesting that the original estimate resulted from gross negligence by the Trenwick directors. Because the complaint suggests that the amount was set based on advice from professional advisors,[69] that inference is even less sustainable.

In that same vein, it is notable that public documents that the complaint quotes from and relies upon refer to the fact that the Trenwick board received advice from investment bankers in connection with the Chartwell and LaSalle mergers, and that these mergers were approved by the Trenwick stockholders, as well as the stockholders of Chartwell and LaSalle. Notably, the stockholders of Chartwell and LaSalle received stock in the Trenwick entity resulting after each merger, not cash.

At bottom, the complaint attempts to challenge the wisdom of an independent board's strategy to grow by acquiring, for stock, third-parties in the same industry, with the approval of its public stockholders. Other than identifying that the $100 million in excess coverage was not enough, the complaint rests solely on the reality that the larger entity that resulted ultimately filed for bankruptcy nearly three years after the final acquisition and reorganization were completed.

■ But business failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit. If the mere fact that a strategy turned out poorly is in itself sufficient to create an inference that the directors who approved it breached their fiduciary duties, the business judgment rule will have been denuded of much of its utility.[70]

67. Compl. ¶ 35.

68. *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del.Ch.1996).

69. *See* 8 Del. C. § 141(e).

70. *See, e.g., Litt v. Wycoff*, 2003 WL 1794724, at *10 (Del.Ch. Mar. 28, 2003) ("The exercise of business judgment cannot be evaluated, as the Plaintiff seems to suggest, merely by look-

ing at the results of that business judgment. While challenges are seldom, if ever, made to business judgments that turn out well, the simple fact that the business decision caused significant loss does not dictate how that decision should be classified or evaluated."); *Gagliardi*, 683 A.2d at 1052 ("The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liabil-

Precisely because the business judgment rule serves an important purpose, our law requires that a plaintiff plead facts supporting an inference that directors committed a cognizable breach of duty. To state a claim for gross negligence, a complaint might allege, by way of example, that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation. To state a claim of disloyalty, a complaint might allege that a board undertook an acquisition of a company controlled by one of its directors because that director was having financial problems and the board, in bad faith, decided to prefer his interests to that of the company. What a plaintiff may not do, however, is simply allege that a majority independent board undertook a business strategy that was "all consuming and foolhardy"[71] and that turned out badly and thereby seek to have the court infer that the later failure resulted from a grossly deficient level of effort or from disloyal motives.

That is all that the Litigation Trust has done here. Therefore, the Litigation Trust has not stated a claim that the directors of Trenwick breached their duty of care or loyalty to Trenwick itself in approving the Chartwell and LaSalle mergers, and the reorganization of Trenwick.

I emphasize Trenwick itself for a reason. As I understand Delaware law, the Litigation Trust may not assert claims on behalf of Trenwick America against the Trenwick board of directors without piercing Trenwick's veil in some manner. That is, if there was a breach of fiduciary duty by

conduct at the Trenwick-level toward Trenwick America, the proper defendant is Trenwick itself, as the parent corporation, not the directors of Trenwick. Delaware law does not blithely ignore corporate formalities and the Litigation Trust has not explained how the Trenwick directors, as opposed to Trenwick, can be deemed to be a "controlling stockholder" group that owes fiduciary duties to a subsidiary.

To this point, I also do not believe that Trenwick America is permitted to do an end-run around Trenwick's exculpatory charter provision. A judicial acknowledgement that, as a matter of the common law of equity, directors of a public company protected by an exculpatory charter provision may be exposed to negligence-based liability claims made by the public company's wholly-owned subsidiaries would undercut the important public policy reflected in 8 *Del. C.* § 102(b)(7). Out of nowhere independent directors of parent corporations would face, in a litigation context in which firm failure is a given, due care claims by entities to which our law has said the parent itself does not owe any fiduciary duties. To sanction such bizarre claims would discourage board service and create uncertainty about the extent to which parent corporations could deploy their organization's assets in a good faith effort to undertake risky strategies that promise future profit. Put simply, even if one were to conclude (as I do not) that Trenwick America can proceed against the Trenwick directors directly, at the very least Trenwick America would have to plead a claim not exculpated by the Trenwick charter. It has failed to do so.

---

ity. That is the hard core of the business judgment doctrine."); *Rabkin v. Philip A. Hunt Chemical Corp.,* 547 A.2d 963, 972 (Del. Ch.1986) (noting that without factual allegations that support that a board's decision was

uninformed or grossly negligent, mere dissatisfaction about how directors exercised their business judgment does not state a claim).

**71.** Compl. ¶ 35.

Of course, I must deal with the Litigation Trust's assertion that Trenwick America may complain about the conduct of the Trenwick directors because Trenwick and Trenwick America were "insolvent" at all relevant times. The most immediate response is the easiest: the mere incantation of the word insolvency does not open the key to discovery.

If a plaintiff seeks to state a claim premised on the notion that a corporation was insolvent and that the directors of the corporation were therefore obligated to consider the corporation's creditors, as an object of their fiduciary beneficence, the plaintiff must plead facts supporting an inference that the corporation was in fact insolvent at the relevant time.[72] Here, the Litigation Trust cursorily alleges that Trenwick and Trenwick America were insolvent, not just after, but even before the Chartwell and LaSalle mergers, and irrespective of the fact that Trenwick did not file for bankruptcy until August 2003. The most specific allegation of the complaint alleges that the U.S. subsidiaries that ended up under Trenwick America after the

post-LaSalle reorganization (e.g., Insurance Company of New York, Chartwell Reinsurance, and Trenwick America Reinsurance Corporation) had a fair market value of $565 million before the reorganization but that once these entities became subsidiaries of Trenwick America through the merger, their net book value was reduced to only $204 million[73] because Trenwick America had increased the debt it was responsible for after the merger by becoming the primary obligor of the $260 million revolver, remaining as a secondary guarantor of $230 million letter of credit, and taking on liability for the $190 million in Assumed Notes. That was a sizable reduction, no doubt, but one that left Trenwick America well north of insolvency, having a net book value of over $200 million.[74] Because the complaint fails to plead facts supporting a rational inference that Trenwick or Trenwick America were insolvent at the time of any of the challenged transactions, the premise for the Litigation Trust's fiduciary duty claim does not exist.[75]

---

**72.** *E.g., U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 947 (Del.Ch.2004), *rev'd on other grounds,* 875 A.2d 632 (Del.2005).

**73.** Compl. ¶ 89.

**74.** Insolvency in fact occurs at the moment when the entity "has liabilities in excess of a reasonable market value of assets held." *See Blackmore Partners, L.P. v. Link Energy LLC,* 2005 WL 2709639, at *6 (Del.Ch. Oct. 14, 2005) (quoting *Geyer v. Ingersoll Publ'ns,* 621 A.2d 784, 789 (Del.Ch.1992)).

**75.** In an incisive article and a thoughtful blog comment, Professor Bainbridge is critical of jurisprudence that expresses the view that directors owe fiduciary duties to the corporation itself, rather than a particular constituency of the corporation. *See* Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency* (forthcoming 2006), *available at* http://ssrn.com/abstract=832504; Duties of

Directors of Insolvent Corporations, http://www.professorbainbridge.com/2006/07/duties_of_direc.html (July 26, 2006). When a corporation is solvent, Professor Bainbridge believes that fiduciary duties are owed by the directors to the stockholders. Bainbridge, *Much Ado,* at 5–6. When a corporation is insolvent, he accepts the notion that the directors owe their fiduciary duties to the creditors, because the creditors are now the residual claimants. *Id.* at 15. That does not mean, however, that Professor Bainbridge believes that all claims against directors of insolvent corporations are direct claims belonging to the creditors individually. To the contrary, he recognizes that if the directors of an insolvent firm commit a breach of fiduciary duty reducing the value of the firm, any claim belongs to the entity and that creditors would benefit from the recovery derivatively, based on their claim on the firm's assets. *Id.* at 38; Duties of Directors of Insolvent Corporations. Supporting his view that owing fiduciary duties to a firm is an

For the sake of completeness, it is useful to consider the last-gasp theory that the

unhelpful concept, Professor Bainbridge relies heavily on the idea of the corporation as a nexus of contracts to which it is silly to think duties can be owed. *See* Bainbridge, *Much Ado*, at 21 n. 94, n. 96 (citing to HENRY HANSMANN, THE OWNERSHIP OF ENTERPRISE 18 (1996) and Stephen M. Bainbridge, *The Board of Directors as a Nexus of Contracts*, 88 IOWA L.REV. 1 (2002)). His concern is that telling directors that they owe fiduciary duties to a "nexus of contracts" provides no concrete objective against which to measure their conduct; thus, he favors clarity that the directors' obligation is to maximize returns for the corporation's residual claimants, who in the case of insolvency, are its creditors.

Although Professor Bainbridge's views regarding the substantive effect the question of insolvency should have on directors' ability to rely upon the business judgment rule and on the application of the derivative/direct claim distinction is identical to mine—short answer: none—I am not as critical as he of references to the directors owing duties to the insolvent corporation itself. *See, e.g., In re Scott Acq. Corp.*, 344 B.R. 283, 2006 WL 1731277, *5–*7 (Bankr.D.Del. June 23, 2006) ("[T]he fact of insolvency does not change the primary object of the directors' duties, which is the firm itself."). That expression might be shorthand that elides the rich academic debates about what corporations are but the expression seems to be used to advance an end that Bainbridge supports. Even when a corporation is solvent, the notion that the directors should pursue the best interests of the equityholders does not prevent them from making a myriad of judgments about how generous or stingy to be to other corporate constituencies in areas where there is no precise legal obligation to those constituencies. I do not understand this complexity to diminish when a firm is insolvent simply because the residual claimants are now creditors. Indeed, it is not immediately apparent to me why, if the common law were to begin to dole out in insolvency special, non-contractual "ward" rights to certain constituencies that transformed in a material way the obligations of directors, creditors would be the primary object of that (difficult to legitimize) act of judicial invention. Better for society that those who manage them see them as something more importantly human, as societal institutions freighted with the goal·of responsible wealth creation. In the insolvency context, directors have, in my view, no less discretion, for example, to decide to accord respectful and considerate treatment to the company's workers (who as Bainbridge admits, may have made more of a non-diversifiable risk with less opportunity to use the tool of contract as a shield) if they believe that will improve the firm's value and the return to its creditors.

In other words, insolvency does not suddenly turn directors into mere collection agents. Rather, the creditors become the enforcement agents of fiduciary duties because the corporation's wallet cannot handle the legal obligations owed. Theft from the firm remains theft from the firm, even if the firm as seen by academics is a legal fiction. In other words, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights. Because, by contract, the creditors have the right to benefit from the firm's operations until they are fully repaid, it is they who have an interest in ensuring that the directors comply with their traditional fiduciary duties of loyalty and care. Any wrongful self-dealing, for example, injures creditors as a class by reducing the assets of the firm available to satisfy creditors. To ensure that the directors manage the enterprise to maximize its value so that the firm can meet as many of its obligations to creditors as possible—the new goal of the firm— the jurisprudence refers to the directors as owing fiduciary duties to the firm and its creditors. *E.g., In re Scott Acq. Corp.*, 344 B.R. 283, 2006 WL 1731277, at *5; *Credit Lyonnais, Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 & 34 n. 55 (Del.Ch. Dec. 30, 1991) ("At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise."). The judicial decisions indicating that directors owe fiduciary duties to the firm when it is insolvent are not, in my view, at odds with Bainbridge's fundamental perspective; indeed, they seem to me more a judicial method of attempting to reinforce the idea that the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm. To this point, many firm life cycles have involved an emergence from bankruptcy with the firms' former creditors emerging in the form of the firms' new equityholders.

Litigation Trust most stressed at oral argument. This last-gasp theory concedes that certain aspects of the complaint are just silly. Namely, it concedes that Trenwick's board could, as an ordinary matter, use the assets of Trenwick America to help procure financing for an acquisition strategy that Trenwick, as Trenwick America's sole stockholder, believed would be profitable for the overall Trenwick empire. What Trenwick could not do, however, is to defraud the creditors of Trenwick America in order to benefit itself.

Supposedly, the reorganization of Trenwick's subsidiaries in connection with the LaSalle transaction was such a maneuver. As was discussed in colloquy at argument, the Litigation Trust now contends that by the time of the LaSalle merger, Trenwick's board knew the entity could not prosper as a whole. Therefore, it allegedly concentrated its largest liabilities and worst-performing assets in the line of subsidiaries under Trenwick America, on the theory that it would allow that line to fail, leaving the rest of Trenwick to thrive.

There is a fatal problem for this theory, however, which is that there are not pled facts to support it. Nothing in the complaint suggests that Trenwick was able to off-load its own ultimate responsibility for the $490 million in debt to Trenwick America alone. Trenwick America's assets were used by Trenwick to support debt procured by Trenwick.[76] Trenwick itself went into bankruptcy at the same time as Trenwick America.

Furthermore, despite all its rhetoric about a three-card monte, the Litigation Trust has never rationally articulated how the reorganization of Trenwick's subsidiar-

ies worked a particular injury on Trenwick itself or Trenwick America. It appears to be the case that Trenwick America emerged out of the reorganization being primarily responsible for the $260 million credit revolver, secondarily responsible for the Lloyd's line of credit (if Trenwick International could not pay it off), and having responsibility for $190 million in Assumed Notes. But Trenwick America also emerged out of the internal restructuring as the subsidiary under which all of Trenwick's U.S. subsidiaries operated. For the year ending December 31, 2002, these consolidated American operations generated approximately 52% of Trenwick's revenues, generating $571 million in annual revenue.[77]

One can accept the notion that Trenwick as a whole, and Trenwick America, in general, emerged from the Chartwell and LaSalle transactions as a more leveraged organization. Trenwick also was a much larger overall operation, having absorbed Sorema, Chartwell, and LaSalle in less than four years.

What the complaint fails to plead are facts supporting an inference that Trenwick America was insolvent as of the time of the restructuring, much less that the Trenwick directors believed that to be the case. In this connection, it is important to recognize that the plain terms of documents the complaint draws from and references to—the LaSalle merger proxy and the Trenwick/LaSalle Joint Proxy Statement—explain the purpose of the restructuring. Namely, the restructuring was undertaken in order to create chains of American, English, and Bermudan subsid-

---

76. *See* Hefter Decl. Ex. C Ex. 10.1 at §§ 5.08, 6.14, 10 (Credit Agreement dated Nov. 24, 1999 between Trenwick and lenders); Stone Aff. Ex. 7 at F–17 (Trenwick America 10–K filed Apr. 2, 2001).

77. Stone Aff. Ex. 1 at 11 (Trenwick America Amended Disclosure Statement For Plan Of Reorganization).

iaries, chains that would enable favorable tax treatment for Trenwick.

The complaint fails to articulate a rational premise for the notion that the restructuring, and the allocation of Trenwick's debt among the various chains, had some other, less obvious, and more nefarious purpose. In particular, there are no facts pled that support a rational inference that Trenwick's board believed it was structuring the chains such that the Bermudan and English chains would thrive, while leaving a debt-ridden and diseased American chain to fall into bankruptcy, leaving its creditors unsatisfied. Indeed, because Trenwick itself remained responsible for the $490 million credit facility, there is not even a pleading-stage plausibility that such a strategy was embarked upon consciously. And the fact that Trenwick remained on the hook for the $490 million debt combines with the reality that it is difficult to conceive how such an unusual strategy could make sense for Trenwick, as a public company, even if Trenwick America's failure could be cabined, without recourse to Trenwick by Trenwick America's creditors. In that scenario, Trenwick would have to come out a financial winner after entirely losing its invested capital in all its U.S. operations and after suffering great injury to its global credibility as an insurance provider and as a borrower by seeing its largest operations fall into the disrepute of bankruptcy.

Finally, it is important to point out that my refusal to conclude that a wholly-owned subsidiary may sue the directors of its parent company on the premise that their improvident business strategies ultimately led to the bankruptcy of the subsidiary does not leave open a gap in the law. There is no chasm.

The laws of all states and the federal bankruptcy laws address precisely the scenario the Litigation Trust contends occurred in the reorganization but fails to plead. They do so through a body of law that might be fairly called the "law of fraudulent transfer." [78]

Under the relevant Delaware statute,[79] creditors of Trenwick America were entitled to attack the reorganization on the grounds that:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[80]

---

**78.** While most states have adopted the more expansive Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act is still law in some states while a few remaining states continue to follow the old common law standards based on "badges of fraud." *See generally* Jonathan C. Lipson, *Enron, Asset Securitization and Bankruptcy Reform: Dead or Dormant?*, 11 J. Bank. L. & Prac. 101, 111 (2002).

**79.** 6 *Del. C.* § 1301, *et. seq.*

**80.** 6 *Del. C.* § 1304(a).

Likewise, the Bankruptcy Code permits fraudulent transfer actions to be brought under sections 544(b) or 548.[81] Section 544(b) allows a trustee or debtor-in-possession to bring an action to avoid any transfer of an interest in property that a creditor may avoid under applicable state law.[82] Similarly, § 548 allows a trustee or debtor-in-possession to commence a federal fraudulent conveyance action to avoid certain transfers made or incurred within two years before the date of the filing of the bankruptcy petition.[83] More specifically, § 548 allows the trustee to avoid any transfer made for less than reasonable equivalent value and made at a time when the transferor was insolvent, engaged in a business for which it had unreasonably small capital, or intended to incur debts beyond its ability to pay.

Both state law and federal law provide a panoply of remedies in order to protect creditors injured by a wrongful conveyance, including avoidance, attachment, injunctions, appointment of a receiver, and virtually any other relief the circumstances may require.[84] In a fraudulent conveyance suit challenging the reorganization, Trenwick itself would have been a proper defendant—as the supposed beneficiary of the fraudulent transfers from Trenwick America—and the creditors of Trenwick America would have had direct standing to prosecute an action.

The law of fraudulent conveyance is, of course, not the only or primary protection for creditors. The financial creditors of companies like Trenwick and Trenwick America know how to craft contractual protections that restrict their debtors' use of assets. In a situation when creditors cannot state a claim that such contractual protections have been breached and cannot prove a fraudulent conveyance claim, the creditors' frustration does not mean that there is a gap in the remedial fabric of the business law that equity should fill. Rather, it means that we remain a society that recognizes that reward and risk go together, and that there will be situations when business failure results in both equity and debt-holders losing some money. As this court has said:

> Having complied with all legal obligations owed to the firm's creditors, the board would ... ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value.[85]

If the common law is to evolve in a direction where judges invent quasi-fraudulent conveyance actions to be brought by subsidiaries against the independent directors of public companies, it should do so in more compelling circumstances than these. The Litigation Trust's complaint pleads no rational reason why the independent board majority stood to benefit personally from undertaking a foolish business strategy. Nothing in the reorganization helped them enrich themselves. Even assuming the odd notion that the

---

81. *See* 11 U.S.C. §§ 544(b), 548.

82. 11 U.S.C. § 544(b).

83. 11 U.S.C. § 548. At the time Trenwick America filed its bankruptcy petition, the reach-back period for enforcement under § 548 was only one year.

84. *E.g.*, 6 *Del. C.* § 1307; 11 U.S.C. §§ 544, 548. Other common remedies available to injured creditors are replevin, sequestration, constructive trust, equitable liens, and garnishment.

85. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790 (Del.Ch.2004).

Trenwick board sought to benefit Trenwick by sacrificing its entire U.S. operations to bankruptcy, the beneficiary of that strategy would have been Trenwick itself and the law of fraudulent conveyance permitted creditors to seek relief against Trenwick.[86]

For all these reasons, I conclude, among other things, that: (1) the Litigation Trust has no standing to sue the directors of Trenwick; (2) even assuming the Litigation Trust could sue the directors of its parent, rather than the parent itself, the Litigation Trust has not stated a claim that the Trenwick directors breached any fiduciary duty owed to Trenwick; and (3) the Litigation Trust has failed to plead facts supporting an inference that Trenwick or Trenwick America were insolvent at any of the relevant times, and therefore has not pled fact supporting an inference that Trenwick owed any fiduciary duties to Trenwick America at the time of the challenged transactions.

## C. The Litigation Trust Also Fails To State A Claim Against Trenwick America's Former Directors

The Litigation Trust also pleads a breach of fiduciary duty claim against the directors of Trenwick America. This claim stands, in one respect, on firmer ground. That is because as directors of Trenwick America, these defendants would be, in the language of many of our cases,[87] described as owing fiduciary duties to Trenwick America as an entity.

■ But even the straightforward notion that the Trenwick America directors owed the company fiduciary duties must not be viewed as a simple one. The context is what matters.[88] To the extent that Trenwick America was a wholly-owned solvent subsidiary of Trenwick, the fiduciary duties owed by the Trenwick America board ran to Trenwick. Our Supreme Court has made clear that, "in a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."[89] Likewise, this court, through then Vice–Chancellor, now Chief Justice Steele, has noted that this is not a novel concept, but a long "settled rule[ ] of law."[90]

Here, that settled rule of law is of critical importance. The only Trenwick America director on the Trenwick board was defendant James Billett, who was CEO of Trenwick. The remaining members of the Trenwick America board were also employees of Trenwick and Trenwick America. That is, all Trenwick America owed their employment to Trenwick.

**86.** As to this, see *infra* note 97.

**87.** *E.g., Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve.") (citing *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939)); *Credit Lyonnais,* 1991 WL 277613 at 34 & 34 n. 55; *Arnold v. Society for Sav. Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996) ("It is well established that the directors of a Delaware corporation have a fiduciary relationship with the corporation they serve . . . .").

**88.** Professor Bainbridge's thoughts on this subject, touched on at *supra* note 75, have obvious relevance here. As he points out, simply saying that a director owes duties to the firm does little to define what those duties are and the end to which they are directed.

**89.** *E.g., Anadarko Petro. Corp.,* 545 A.2d at 1174 (citing *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971)).

**90.** *Shaev v. Wyly,* 1998 WL 13858, at *2 (Del. Ch. Jan. 6, 1998) (quoting *Anadarko*); *Goodman v. Futrovsky,* 213 A.2d 899, 902 (Del. 1965).

The Litigation Trust tries to argue that this mundane fact supports an inference of disloyalty and conflict of interest. In its fiduciary duty count, the Litigation Trust states that the Trenwick America directors "did not exercise their independent, disinterested business judgment as to the[ ] [challenged transactions], as they were all officers of Trenwick America and owed their livelihood to [Trenwick America's] controlling shareholder[ ], [Trenwick]." [91] Insofar as this statement is intended to suggest a motive on the part of the Trenwick America directors to injure the long-term health of that entity, it fails entirely of its purpose.

Indeed, the complaint as a whole suggests that the directors of Trenwick America had every interest in ensuring that the company would remain profitable. They owed their salaries to the company and had accepted replacement options in the new Trenwick resulting after the LaSalle merger. One cannot conjure up from the absence of facts in the complaint a scenario whereby these directors had a personal motive to undermine the long-term viability of Trenwick's U.S. operations, particularly since each of the Trenwick America directors is alleged to have been domiciled in Connecticut and functioning as an officer of Trenwick America—i.e., they are alleged to have been the key managers of Trenwick's domestic U.S. operations.

█ Not only that, the complaint is entirely devoid of pled facts regarding what the Trenwick America board did that was either a breach of the duty of care or the duty of loyalty. In the former respect, I take it as no novelty for me to hold that the Trenwick America board had no duty to replicate the deliberative process of its sole stockholder's board of directors. In the absence of any indication that they would be causing Trenwick America to violate legal obligations owed to others, the Trenwick America board was free to take action in aid of its parent's business strategy.[92] There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes, thereby setting in motion an inefficient intergenerational *Van Gorkom*-machine spreading the powerful procedural mandate of *Van Gorkom* and its progeny to every level of the corporate family.[93] Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another.

Rather, the law is that the Trenwick America directors were obligated to manage Trenwick America with loyalty to Trenwick, the company's sole stockholder. To the extent that the Trenwick America directors acceded to their parent's wishes and lent support to its business strategy, there is no basis to fault them.

That is even so if the Trenwick America board took actions that made Trenwick America less valuable as an entity. If the Trenwick America board authorized the subsidiary to provide (as it appears to have done) guarantees to Trenwick's creditors that supported Trenwick's overall business, they would have been managing the subsidiary to benefit its parent: a proper

---

91. Compl. ¶ 100.

92. *See, e.g., Cochran v. Stifel Financial Corp.,* 2000 WL 286722, at *11 ("A wholly-owned subsidiary is to be managed solely so as to

benefit its corporate parent") (citing *Anadarko,* 545 A.2d at 1174).

93. *See generally Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985).

goal. Such guarantees may reduce the value of the subsidiary conceived as a stand-alone entity but that in itself is of no moment. The payment of a dividend from a subsidiary to a parent does the same thing. If the dividend remains in the subsidiary, the subsidiary is better able to satisfy the future claims of creditors and to conduct its own operations. In pondering whether to pay a dividend, however, a subsidiary board is permitted to act to benefit its parent, not simply the subsidiary itself, for the obvious reason that wholly-owned subsidiaries are formed by parents to benefit the parents, and not for their own sake.[94]

Again, the implications of the complaint's incantation of the word "insolvency" must be considered. To begin with, I reiterate that the complaint fails to plead facts supporting a rational inference that Trenwick America was insolvent before any of the challenged transactions or that any of the challenged transactions would, when consummated, leave Trenwick America unable to satisfy its creditors. As a result, the Litigation Trust cannot base a claim on the idea that the Trenwick America directors owed fiduciary obligations to Trenwick America's creditors at the time of the challenged transactions. Because the complaint fails to support an inference of insolvency, the Trenwick America directors were free to manage Trenwick America for the best interests of Trenwick,

and to follow loyally the direction of Trenwick's board as to what Trenwick's best interests were. The reality that the parent's strategy ultimately turned out poorly for itself and its subsidiaries does not buttress a claim by the subsidiary that the subsidiary's directors acted culpably by implementing the parent's prior wishes.

In this respect, it is notable that the charter of Trenwick America did not contain an exculpatory charter provision. The reasons why it did not are not clear, but one might be that Trenwick, as sole stockholder and the entity on behalf of whom the subsidiary was to be run, wanted to reserve the right to fault the Trenwick America directors if they breached an obligation of due care they owed as subsidiary directors. In the usual course, Trenwick, as sole owner, could exercise its control over Trenwick America to press any derivative claims. That Trenwick America has become bankrupt and its claims are now controlled by the Litigation Trust cannot act as a basis to retroactively impose procedural duties upon the Trenwick America board it did not bear at the time of the challenged transactions. In other words, because the Trenwick America board, as directors of a wholly-owned subsidiary, was entitled to follow the parent's instructions unless those instructions required the board to violate the legal rights of others, no due care claim may be brought against them.[95] Otherwise, a subsidiary board

---

**94.** "It is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent." *Grace Bros. v. UniHolding Corp.*, 2000 WL 982401, at *12 (Del.Ch. July 12, 2000); *see also Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del.1988) (same).

**95.** The decision in *McMullin v. Beran*, 765 A.2d 910 (Del.2000), does not aid the Litigation Trust. That decision is controversial for several reasons, one of which is that it imposed *Van Gorkom*-like duties on the board of

a non-wholly owned subsidiary board with regard to a merger in which the parent and the minority stockholders received identical consideration. Transactions where the minority receive the same consideration as the majority, particularly a majority entitled to sell its own position for a premium, had long been thought to fall within the ambit of non-conflict transactions subject to business judgment rule protection. *See, e.g., Puma v. Marriott*, 283 A.2d 693 (Del.Ch.1971); DAVID A. DREXLER, LEWIS S. BLACK, JR., & A. GILCHRIST SPARKS, III. DELAWARE CORP. LAW AND PRACTICE

could not follow parental direction without risk that the failure of the parent's business strategy, and thus the subsidiary, would later expose the subsidiary board to negligence-based liability for its loyalty to the parent. A care-based claim premised on an act of fiduciary loyalty!

If there is conceptual room for equity in this context, that room is quite narrow. At most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet its legal obligations.[96] Any lesser standard would undercut the utility of the business judgment rule by permitting creditors to second-guess good faith action simply because the subsidiary ultimately became insolvent. Even the recognition of a cause of action along stringent lines requires careful consideration. Despite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action for "aiding and abetting."[97] Rather, as the both the defendants and the Litigation Trust agree, the only proper defendants in a fraudulent conveyance action under federal bankruptcy law or Delaware law are the transferor and any transferees.[98] In any event, there is no need to hold that such a cause of action does or does not exist under our law. The complaint does not plead facts supporting an inference that Trenwick America was rendered insolvent by the challenged transaction, much less that the

§ 15.11, at 15–75 (2002). In any event, what is critical here is that *McMullin* does not purport to hold that the board of a wholly-owned subsidiary must engage in a separate process of deliberation in order to consider whether a parent's acquisition strategy is sound, even if that strategy requires financial support or other aid from the subsidiary.

96. In a recent decision, Judge Walsh of the District of Delaware Bankruptcy Court held that the directors and officers of a wholly-owned insolvent subsidiary owe a fiduciary duty to that subsidiary and its creditors. *See In re Scott Acq. Corp.*, 344 B.R. 283, 2006 WL 1731277, at *5. In that case, the defendant directors of an insolvent subsidiary argued that they could not be held liable to the creditors of the subsidiary because they owed their duties solely to the parent corporation. The court rejected that argument and held that the plaintiff trustee had stated a claim for breach of fiduciary duties against the officers and directors. Judge Walsh explained that a director's fiduciary duty to creditors is derivative of the duty owed to the corporation. As Professor Bainbridge notes, see *supra* note 88, the idea that the subsidiary directors could be exposed to a claim for breach of fiduciary duty in this context can be rationalized in traditional terms. If the firm is insolvent, its residual claimants are the creditors and it is for their benefit that the directors must now manage the firm. A purposeful fraudulent transfer to stockholders who are "out of the money" is obviously inconsistent with the best interest of the creditors, the firm's new residual claimants.

97. *See, e.g., Mack v. Newton*, 737 F.2d 1343, 1357–58 (5th Cir.1984) ("[T]he general rule under the Bankruptcy Act is that one who did not actually receive any of the property fraudulently transferred ... will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer ....") (citing *Elliott v. Glushon*, 390 F.2d 514 (9th Cir.1967)); *Ernst & Young LLP v. Baker O'Neal Holdings., Inc.*, 2004 WL 771230, at *14 (So.D.Ind.2004) (surveying several cases holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act and noting that the court is not permitted to assign liability where the Act did not); *Freeman v. First Union Nat'l Bank*, 865 So.2d 1272, 1275–77 (Fla.2004) (stating that the UFTA was not intended "to serve as a vehicle by which a creditor may bring a suit against a non-transferee party ... for monetary damages arising from the non-transferee's alleged aiding-abetting of a fraudulent money transfer").

98. *See* 11 U.S.C §§ 544(b), 550(a); 6 *Del. C.* § 1308(b).

Trenwick America board knew that was the case.

For these reasons, the Litigation Trust has failed to state a claim for breach of fiduciary duty against the former Trenwick America directors.

### D. *Delaware Law Does Not Recognize A Cause Of Action For So–Called "Deepening Insolvency"*

In Count II of the complaint, the Litigation Trust seeks to state a claim against the former Trenwick America directors for "deepening insolvency." The Count consists of the following cursory allegations:

> From 2000 until 2003, these [Trenwick America] Defendants fraudulently concealed the true nature and extent of [Trenwick America's] financial problems by expanding the amount of debt undertaken by [Trenwick America].[99]
>
> The [Trenwick America] Defendants knew that [Trenwick America] would not be able to repay this increased debt, but fraudulently represented to creditors and other outsiders that the debt would be repaid.[100]
>
> By these actions, [Trenwick America's] officers and directors prolonged the cor-

porate life of [Trenwick America] and increased its insolvency, until [Trenwick America] was forced to file for bankruptcy on August 20, 2003.[101]

> As a result of [those] actions, [Trenwick America] suffered damages to be proven at trail, which [the Litigation Trust] is entitled to recover.[102]

The concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness.

■ Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. Even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm. As a thoughtful federal decision recognizes, Chapter 11 of the Bankruptcy Code expresses a societal recognition that an insolvent corporation's creditors (and society as a whole) may benefit if the corporation continues to conduct operations in the hope of turning things around.[103]

---

99. Compl. ¶ 104.

100. *Id.* ¶ 105.

101. *Id.* ¶ 106.

102. *Id.* ¶ 107.

103. *See, e.g., Kittay v. Atlantic Bank of N.Y. (In re Global Servs.)*, 316 B.R. 451, 460 (Bankr.S.D.N.Y.2004) ("The fiduciaries of an insolvent business might well conclude that the company should continue to operate in order to maximize its "long-term wealth creating capacity," or more generally, its enterprise value. In fact, chapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead."). *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("The fundamental purpose of reorganization

is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, at *8 (Bankr.S.D.N.Y. Dec. 11, 2003) ("It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can 'work out' its problems or should file a bankruptcy petition."); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 655 (Bankr.N.D.Ill.1998) (noting there is no duty "to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative"), *aff'd in part & rev'd in other part*, 2000 WL 28266 (N.D.Ill.2000); H.R.Rep. No. 95–595, at 220 (1977), *as reprinted in* 95th Cong., 1st Sess. 1978 U.S.Code.Cong. & Ad-

■ If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

The rejection of an independent cause of action for deepening insolvency does not absolve directors of insolvent corporations of responsibility. Rather, it remits plaintiffs to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty and for fraud. The contours of these causes of action have been carefully shaped by generations of experience, in order to balance the societal interests in protecting investors and creditors against exploitation by directors and in providing directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of failure. If a plaintiff cannot state a claim that the directors of an insolvent corporation acted disloyally or without due care in implementing a busi-

ness strategy, it may not cure that deficiency simply by alleging that the corporation became more insolvent as a result of the failed strategy.

Moreover, the fact of insolvency does not render the concept of "deepening insolvency" a more logical one than the concept of "shallowing profitability." That is, the mere fact that a business in the red gets redder when a business decision goes wrong and a business in the black gets paler does not explain why the law should recognize an independent cause of action based on the decline in enterprise value in the crimson setting and not in the darker one. If in either setting the directors remain responsible to exercise their business judgment considering the company's business context, then the appropriate tool to examine the conduct of the directors is the traditional fiduciary duty ruler. No doubt the fact of insolvency might weigh heavily in a court's analysis of, for example, whether the board acted with fidelity and care in deciding to undertake more debt to continue the company's operations, but that is the proper role of insolvency, to act as an important contextual fact in the fiduciary duty metric. In that context, our law already requires the directors of an insolvent corporation to consider, as fiduciaries, the interests of the corporation's creditors who, by definition, are owed more than the corporation has the wallet to repay.[104]

---

min.News, pp. 5963, 6179 ("The premise of a business reorganization is that assets that are used for production in the industry for which they are designed are more valuable than those same assets sold for scrap ... It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.").

**104.** *See, e.g., Prod. Res. Group,* 863 A.2d at 791 (Del.Ch.2004) ("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors. This is an uncontroversial proposition

and does not completely turn on its head the equitable obligations of the directors to the firm itself. The directors continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders-that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever re-

In this case, the Litigation Trust has not stated a viable claim for breach of fiduciary duty. It may not escape that failure by seeking to have this court recognize a loose phrase as a cause of action under our law, when that recognition would be inconsistent with the principles shaping our state's corporate law. In so ruling, I reach a result consistent with a growing body of federal jurisprudence, which has recognized that those federal courts that became infatuated with the concept, did not look closely enough at the object of their ardor.[105] Among the earlier federal decisions embracing the notion—by way of a hopeful prediction of state law—that deepening insolvency should be recognized as a cause of action admittedly were three decisions from within the federal Circuit of which Delaware is a part.[106] None of

mains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.") (internal citations omitted); *Angelo, Gordon & Co. v. Allied Riser Comm. Corp.*, 805 A.2d 221, 229 (Del.Ch.2002) ("Even where the law recognizes that the duties of directors encompass the interests of creditors, there is room for application of the business judgment rule."); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del.Ch.1992) ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors."); *see generally* Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 VAND. L.REV. 1485 (1993).

105. Good examples of this jurisprudence include: *Bondi v. Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587 (S.D.N.Y.2005) (explaining that "[i]f officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable ... that injury is compensable on a claim for breach of fiduciary duty" and declining to recognize a separate tort for deepening insolvency under North Carolina law); *Alberts v. Tuft (In re Greater Southeast. Community Hosp. Corp.)*, 333 B.R. 506, 517 (Bankr.D.C.2005) ("Recognizing that a condition is harmful and calling it a tort are two different things. The District of Columbia courts have not yet recognized a cause of action for deepening insolvency, and this court sees no reason why they should.... There is no point in recognizing and adjudicating "new" causes of action when established ones cover the same ground. The Trust's duplicative claims will be dismissed."); *In re VarTec Telecom, Inc.*, 335 B.R. 631, 641, 644 (Bankr.N.D.Tx.2005) (describing recent cases and the trend to decline recognizing deepening insolvency as a separate tort because the injury caused is substantially duplicated by torts already in existence); *In re Global Servs.*, 316 B.R. at 459 ("The distinction between "deepening insolvency" as a tort or damage theory may be one unnecessary to make. Prolonging an insolvent corporation's life, without more, will not result in liability under either approach. Instead, one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt.") (citations omitted); Sabin Willet, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549 (2005) (providing detailed reasons not to recognize deepening insolvency as a cause of action). *See also In re CitX Corp., Inc.*, 448 F.3d 672, 679 n. 11 (3d Cir.2006) (rejecting, as without basis in reason, a request to hold that a claim of negligence will sustain a cause of action for deepening insolvency under Pennsylvania law).

106. *See Official Comm. of Unsec. Creditors v. R.F. Lafferty*, 267 F.3d 340 (3d Cir.2001) (recognizing deepening insolvency as a valid cause of action under Pennsylvania law where defendants used fraudulent financial statements to raise capital in the debtor's name, thereby deepening debtor's insolvency and causing bankruptcy); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 2006 WL 864843, at *16–17 (Bankr.D.Del. Mar. 31, 2006) (holding that Delaware, New York, and North Carolina would recognize the cause of action); *In re Exide Technologies, Inc.*, 299 B.R. 732 (Bankr.D.Del.2003) ("based on the Third Circuit's decision in *Lafferty* and the Delaware courts' policy of providing a remedy for an injury, I conclude that Delaware

those decisions explains the rationale for concluding that deepening insolvency should be recognized as a cause of action or how such recognition would be consistent with traditional concepts of fiduciary responsibility. In a more recent decision, the Third Circuit has taken a more skeptical view of the deepening insolvency concept,[107] a view consistent with the outcome reached in this decision. In fact, many of the decisions that seem to embrace the concept of deepening insolvency do not clarify whether the concept is a standalone cause of action or a measurement of damages (the extent of deepening) for other causes of action.[108]

E. *The Complaint Fails To State A Claim For Fraud Against The Former Directors Of Trenwick And Trenwick America*

The final claim made against the directors of both Trenwick and Trenwick America is that they worked together to commit fraud that injured Trenwick America. This is an extremely odd claim to be advanced on behalf of Trenwick America for an obvious reason: the claim depends on the notion that Trenwick America's controlling stockholder, Trenwick, and Trenwick America's board, in particular, Billett, who was on the parent board as well, knew facts about Trenwick America that they concealed from Trenwick America. As I will explain, that reality is but one of the

reasons why the complaint fails to state a cognizable fraud claim.

Before I get to that reason, I get to the plain vanilla reason the fraud claim fails, which is that the complaint does not satisfy the stringent pleading standard governing fraud claims. To state a claim for common law fraud, the Litigation Trust must plead facts supporting an inference that: (1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[109] Under Court of Chancery Rule 9(b), a heightened pleading standard applies to fraud claims requiring particularized fact pleading. "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." [110] Similarly, a claim of conspiracy to commit fraud must be pleaded with particularity.[111] The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the

---

Supreme Court would recognize a claim for deepening insolvency when there has been damage to corporate property").

107. *See In re CitX Corp.*, 448 F.3d at 677.

108. *E.g., Lafferty*, 267 F.3d at 351, *clarified by, CitX*, 448 F.3d at 680 n. 11 (explaining that in *Lafferty* "we did describe deepening insolvency as a 'type of injury,' and a 'theory of injury' " but that "we never held it was a valid theory of damages for an independent cause of action.") (citations omitted).

109. *E.g., Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del.Ch. Feb.14, 2006) (citing *DCV Holdings, Inc. v. Conagra, Inc.*, 889 A.2d 954, 958 (Del.2005)); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

110. Del. Ct. Ch. R. 9(b).

111. *E.g., Iotex Commc'ns v. Defries*, 1998 WL 914265, at *3 (Del.Ch. Dec. 21, 1998); *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1066 (Del.Ch.1989).

misrepresentation; and what that person(s) gained from making the misrepresentation.[112] Although Rule 9(b) provides that "knowledge . . . may be averred generally," where pleading a claim of fraud has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[113]

Here, the Litigation Trust does not come close to pleading particularized facts supporting its fraud claim. The complaint just cursorily states that the directors of both parent and subsidiary acted together to:

> fraudulently conceal (a) [Trenwick America's] financial condition from 2000 to 2003; (b) the financial condition and reserve level problems at Chartwell prior to the 1999 merger; (c) the true nature of the intercompany payable supposedly due to Trenwick by Chartwell; (d) the actual value of the LaSalle transaction; and (e) the true value of the various TGI subsidiaries transferred between companies during the restructuring done in preparation for the LaSalle merger.[114] As directors and/or officers of [Trenwick] and [Trenwick America], these defendants had a duty to disclose this information to Plaintiff. Plaintiff relied on these omissions to its detriment.[115]

In addition, the Litigation Trust complains that the Trenwick directors also committed fraud when they made material misstatements of facts, which Trenwick America relied on, in August 2000:

> (a) stating that the "Chartwell acquisition had been beneficial and was expected to result in cost savings"; (b) overstating the amount of intercompany loans given by [Trenwick]; and (c) claiming that the LaSalle acquisition would make Trenwick more competitive in all three of its major markets.[116]

These allegations are precisely the sort of unspecific, broad-brush generalities that Rule 9(b) is intended to preclude from serving as a basis for a fraud claim. Notably absent from the complaint are particularized allegations identifying what aspects of Trenwick's and Trenwick America's financial statements were tainted by improper accounting practices, when those financial statements were made public, and the circumstances that suggest that any inaccuracies were intentional, rather than good faith mistakes in estimation. Perhaps of paramount importance is the insinuation that Trenwick and Trenwick America made knowingly false estimates of the potential insurance claims their operating companies faced. The very public disclosures the complaint refers to expressly indicate that estimates regarding potential claims and the reserves necessary to ad-

---

112. *See Albert v. Alex. Brown Management Services, Inc.*, 2005 WL 2130607, at *7 (Del. Ch. Aug.26, 2005) (citing *York Linings v. Roach*, 1999 WL 608850, at *2 (Del.Ch. July 28, 1999) (internal quotations and citations omitted)). Similar to the strict pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and federal Rule 9(b), Delaware law also does not permit the conclusion that a defendant knew of certain facts involving an organization merely because the defendant had a position of responsibility within that organization. *E.g., Metro*

*Commc'n Corp. BVI v. Adv. Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 n. 50 (Del.Ch. 2004) (citing *Iotex Commc'ns, Inc.*, 1998 WL 914265, at *4–*5).

113. *See Iotex Commc'ns*, 1998 WL 914265, at *4.

114. Compl. ¶ 125.

115. *Id.* at ¶ 126.

116. *Id.* at ¶ 127.

dress them are imprecise and cannot be guaranteed.[117] That such estimates later turned out to be too low does not buttress a fraud claim. What is necessary is the pleading of facts suggesting that the original estimates were fraudulently conceived, from the get-go. This does not require a plaintiff to probe the mindset of the defendants, what it does require is that the plaintiff set forth particularized facts regarding the precise estimates in question, the circumstances suggesting they were unsound from the inception, and why the defendants had an incentive to intentionally low-ball them. The Litigation Trust has not even made a good faith effort to plead its claim. Instead of attempting to meet a Rule 9(b) standard, the Litigation Trust simply argues backwards from the fact of the Trenwick family's eventual bankruptcy that all of its financial statements during the period of the challenged transactions must have contained knowing falsehoods.

Yet, the Litigation Trust does not point to one specific asset of Trenwick or Trenwick America that was overstated in their financial statements. It does not contend that the revenue figures in their financial statements were phony. In the end, it simply argues that Trenwick must have intentionally understated the claims it faced because those claims eventually rose to a level beyond Trenwick's ability to pay them and remain solvent. In other words, there must have been fraud because the estimates eventually turned out wrong. Indeed, the fraud is a subtle one, because the complaint concedes that when Trenwick purchased Chartwell, it required Chartwell to buy $100 million in coverage to cover what Trenwick and its advisors perceived to be a lack of adequate reserves.

■ To this point, it is notable that the Litigation Trust is trying to ground its fraud claims on the softest of turf. For example, it claims that statements by Trenwick that the company believed that the Chartwell acquisition would generate good results were fraudulent. But these sorts of statements are the softest of information, and very difficult to base a fraud claim on for good reason. They are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies.[118] Such opinions and predictions are generally not actionable under Delaware law.[119] The

---

117. *E.g.,* Hefter Decl. Ex. A at 12 (Trenwick 10–K filed Aug. 22, 2000); Stone Aff. Ex. 6 at 11 (Trenwick 10–K filed Apr. 2, 2001).

118. *See In re Oracle Corp.,* 867 A.2d 904, 938 (Del.Ch.2004) ("The more tentative and soft the information, the more reluctant our courts have been to deem it material.")

119. *See, e.g., id.* at 935 ("Because, by their very nature, predictions of the future are less certain than statements about past events, courts have been less apt to find forward-looking statements material and have been more dubious of claims that it was reasonable for investors to rely upon such statements in making trading decisions."); *Solow v. Aspect Res., LLC,* 2004 WL 2694916, at *3, (Del.Ch. Oct. 19, 2004) ("to the extent that plaintiff is arguing that any statements of opinion rise to the level of a fraudulent representation, [such]

statements ... are mere puffery and cannot form the basis for a fraud claim"); *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 554 (Del.Ch.2001) (explaining that predictions about the future and mere opinions cannot give rise to actionable common law fraud); *see also Consol. Fisheries Co. v. Consolid. Solubles Co.,* 112 A.2d 30, 37 (Del. 1955) (stating that it is a general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations) (citations omitted); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos. Inc.,* 75 F.3d 801, 811 (2d.Cir.1996) (explaining that optimistic forward-looking statements that a company would perform well are the type of puffery that bespeak caution and are generally not actionable).

Litigation Trust fails to plead particularized facts regarding these soft statements, precisely what was said, and why what was said was likely, given known facts, to have been a consciously false estimate of the future. To that point, the Litigation Trust does indicate that Trenwick estimated that operational synergies of a certain level could be achieved as a result of the Chartwell merger. It nowhere explains why those estimates were not responsible ones and the mere fact that Chartwell's reserves turned out to be too low does not give rise to an inference that the estimates of operational synergies that could be achieved by combining the insurance operations of Trenwick and Chartwell were irresponsibly prepared. The same deficiency afflicts its allegations regarding the disclosed estimates of the possible claims faced by Trenwick's operating insurance businesses. There are no pled facts, aside from an indication that those estimates turned out to be too low, that suggest that the estimates were irresponsibly prepared, much less that they were intentionally understated by Trenwick or Trenwick America insiders.[120]

■ Even as to harder information, the complaint is entirely conclusory. No facts are included that indicate when or how specific information was fraudulently concealed by the directors nor is any specific information pled supporting the Litigation Trust's contention that Trenwick and Trenwick America's financial records were misstated. The allegations of fraud merely state that the "actual" or "true value" of certain assets and transactions were fraudulently concealed or misstated.[121] The complaint fails to provide any particulars, such as the specific financial items that were allegedly fraudulent and the extent of their inaccuracy. Speculative conclusions unsupported by fact do not allege fraudulent conduct.[122] The complaint's allegations are entirely vague and general, and do not satisfy Rule 9(b).

In all respects, it is relevant that the complaint does not even attempt to describe the level of involvement of either the Trenwick or Trenwick America directors in the preparation of the financial statements and the other disclosures that are challenged. No effort is made to identify deficiencies in the directors' process for considering the financial statements and disclosures. Given that the Litigation Trust's central theory is that the Trenwick board was foolish—i.e., pursued a stupid series of acquisitions—and given that the Trenwick America directors who were employees presumably wished to remain employed by a solvent entity—it is well-nigh impossible to draw an inference that these defendants knew they were being stupid and putting the company (and for some of them, their livelihoods) at stake. Although there is not a duty to plead state of mind with particularity, the requirement to plead the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation[123] exists in large measure so

---

120. *See Iotex Commc'ns*, 1998 WL 914265, at *4–*5.

121. *E.g.*, Compl. ¶¶ 125, 131.

122. *In re Tri–Star Pictures, Inc. Litig.*, 634 A.2d at 326 (explaining that conclusions "will not be accepted as true without specific allegations of fact to support them."); *see also* *Dann v. Chrysler Corp.*, 174 A.2d 696, 700 (Del.Ch.1961) ("Using the word 'fraud' or its equivalent *in any form is just not a substitute* for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

123. *See Albert*, 2005 WL 2130607, at *7.

that defendants are not subjected to fraud claims simply because business plans did not work out as hoped.[124] The requirement of particularized pleading ensures that a plaintiff must plead circumstances suggesting that the defendants were positioned to know that they were making erroneous statements of material facts and had an interest in doing so.[125] That has not been done here.

Recognizing the deficiencies in its complaint, the Litigation Trust devoted much of its briefing on its fraud claims to seeking an exemption from Rule 9(b) for itself. The Litigation Trust argues that Rule 9(b) should be less stringently applied in the context where a plaintiff is a third-party, such as a trustee, because third-parties generally have less information on which to base their allegations. Accordingly, the Litigation Trust maintains that as long as the defendants have notice that is "not vague[ ] or general[ ]," the complaint will meet the requirements of Rule 9(b).[126] That is not a correct statement of law and its logical premise is flawed. Most fraud plaintiffs possess less information than the defendants who made the statements at issue. Protecting those who occupy that vulnerable posture is the essential purpose of the law of fraud—to act as a safeguard when there is reasonable, detrimental reliance on another's statement of fact by someone with less knowledge. More specifically, this would be one of the last scenarios when a court's equitable heartstrings would lead it to do what it should not—that is, undercut a court rule requiring a certain level of pleading. The Litigation Trust has had far more access to information than the typical plaintiff, having access to voluminous documents during the bankruptcy proceedings, for more than a year before it filed its complaint.[127] Thus, it was better positioned than most fraud plaintiffs to meet the standards of Rule 9(b).

Finally, the Litigation Trust fails to plead a fraud claim for another important reason that I adverted to earlier. The Litigation Trust is only entitled to bring claims possessed by Trenwick America. By the Litigation Trust's own admission, Trenwick America's board of directors knew the true facts about all the issues said to have been misrepresented. As a result, Trenwick America—as an entity—did not rely to its detriment on any of the misstatements, despite the cursory statement in the complaint that the "plaintiff" relied on the false statements to its detriment.[128] To the extent that the Litigation Trust is referring to itself, it could not have relied on the statements at issue as it did not exist when those statements were made. To the extent that the Litigation Trust is referring to Trenwick America, its statement makes no sense because the complaint alleges that those who controlled

124. *York Linings*, 1999 WL 608850, at *3 (noting that one of Rule 9(b)'s purposes is to protect defendants from unfounded charges of wrongdoing that could injure their reputation and goodwill, and refusing to sustain a fraud claim based on general allegations by one joint venture partner that the other breached promises made going into the joint venture).

125. See *Albert*, 2005 WL 2130607, at *11; *Metro Commc'ns Corp.*, 854 A.2d at 147 (citing *Iotex Commc'ns*, 1998 WL 914265, at *4).

126. Trust Br. 43–44.

127. In addition, there apparently was an investigation in which the trustee, creditors, and Trenwick America's bankruptcy counsel participated to determine what claims could be brought. See Trial Tr. at 99, 101, 114.

128. See *Albert*, 2005 WL 1594085, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

Trenwick America knew the statements were inaccurate.

Of course, this is not to say that a company like Trenwick America might not possess claims against insiders who injure the company and then cause the company to make false representations that cover up the wrongdoing. But the claim that the disclosing company made misrepresentations is not a fraud claim, it is a claim related to the original wrongdoing. The misdisclosure might have relevance for the vitality of the underlying claim—such as by defeating an argument that a stockholder vote cleansed any breach of fiduciary duty or by tolling a statute of limita-tions[129]—but it would not give rise to a separate claim for fraud.[130] The reason is simple, the entity would not have been relying to its detriment on the fraudulent statement because its controllers were aware of the actual state of affairs. For this reason, our law has treated claims by stockholders that corporate disclosures in connection with a stockholder vote or tender were materially misleading as direct claims belonging to the stockholders who were asked *to vote or tender.*[131]

Therefore, for all these reasons, I conclude that the complaint fails to state a claim of fraud against the Trenwick or Trenwick America directors.[132]

**129.** *See In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 2006 WL 585606, at *6–*7 (Del. Mar. 8, 2006) (reiterating the reality that in a context when a transaction's economic unfairness would cause injury to the corporation itself, disclosure claims have relevance primarily to the standard of review; if the entire fairness standard applies, the ultimate question remains whether the terms of the transaction were substantively fair to the corporation).

**130.** One can also imagine a scenario when a corporation's directors commit fraud, giving rise to liability on the part of the company to third parties. Depending on whether the positive law precludes such a claim, one can conceive of the corporation having a claim for indemnity against the directors to make the company whole for the payments it had to make to the third parties as a result of the directors' wrongdoing.

**131.** *See, e.g., Dieterich v. Harrer,* 857 A.2d 1017, 1029 (Del.Ch.2004).

**132.** The defendants advance another defense I do not rely upon. That defense is premised on the notion that Trenwick America cannot bring a claim against them because the knowledge of Trenwick America's insiders are imputed to it and if the insiders are guilty of fraud, so is Trenwick America. That is, the defense is based on the *in pari delicto* doctrine.

As a judge in Delaware, the federal case law on *in pari delicto* does not strike me as reflecting a nuanced approach to business law. There are certainly situations when an entity could be injured by an insider's misconduct and when the entity, as to third parties, would be charged with knowledge of that misconduct. Suppose, for example, that a board of directors conspired with the company's auditors to embezzle $100 million, giving the auditor a 10% cut if it characterized the stolen funds improperly in the company's financial statements. In that circumstance, the directors' knowledge of the wrongdoing would not bar a derivative suit against the directors and the auditors on behalf of the company, even though a third party relying reasonably on the company's false financial statements might have a basis to sue the company and charge it with its insiders' knowledge. Many of the great corporate scandals have involved concerted activity by company advisors and insiders, activity that sometimes harmed not only outsiders but also, derivatively, the company's innocent stockholders. The doctrine of *in pari delicto* has never operated in Delaware as a bar to providing relief to the innocent by way of a derivative suit. *See also Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995) (explaining that the defense of *in pari delicto* functions to prevent a wrongdoer from profiting from the recovery awarded by a court for the wrong but that when the wrongdoer will not be able to share in the corporation's recovery the defense of *in pari delicto* "loses its sting").

## F. *The Challenges To The Chartwell Transaction Are Time–Barred*

As a more general matter, the defendants are correct that all of the Litigation Trust's challenges to the Chartwell transaction and Trenwick America's guarantee of the $400 million credit facility after that transaction are untimely. More than three years had passed from the date of those transactions before Trenwick America filed for bankruptcy. The facts that Trenwick America had guaranteed that credit facility and that Chartwell's reserves were deemed sufficiently inadequate in the due diligence process to have led Trenwick to demand that Chartwell purchase $100 million in excess coverage before the merger were both publicly disclosed by Trenwick well within the limitations period. So too were numerous facts about Chartwell.

The complaint and the Litigation Trust's briefs do not provide any factual basis for excusing the untimely filing. As with its overall fraud allegations, the Litigation Trust fails to plead that the defendants fraudulently concealed their wrongdoing.[133] Moreover, as noted, within the limitations period, there were abundant facts in the public record about the Chartwell transaction, the effect that had on Trenwick America's debt and Trenwick's operating losses, putting potential plaintiffs on inquiry notice of their claims.[134] Therefore, the portions of the complaint challenging the Chartwell transaction and the financing arrangements entered into in the immediate wake of that transaction are dismissed for the alternative reason that they are time-barred.

## G. *The Ad Hominem Advisor Allegations*

In the complaint, the Litigation Trust named certain high-profile advisors to Trenwick as defendants. Most of the allegations of the complaint involving these advisors can be fairly said to be irrelevant and impertinent material that would justify that rarest of judicial orders, an order striking portions of a pleading.[135] Pages 13 to 19 of the complaint are taken up almost entirely by references to other lawsuits and proceedings in which these advisors have been accused of wrongful or negligent behavior. The magical word "Enron" is bandied about by the Litigation Trust as a substitute for relevant factual pleading.[136] Given the freedom with which the Litigation Trust and its counsel accuse others of intentionally wrongful behavior, their skins should be thick enough to realize that these portions of the complaint wasted the court's time and the defendants' resources. They are frivolous and reflect professionally unacceptable pleading practice.

Once these improper references are put to the side, little remains. The sued defendant advisors consist of Ernst & Young, PriceWaterhouseCoopers, Baker & MacKenzie, and Milliman.

Defendant PriceWaterhouseCoopers is alleged to have acted as the auditor for

---

133. Fraudulent concealment requires an affirmative act of concealment or some misrepresentation by a defendant that prevents a plaintiff from gaining knowledge of the facts. *See Albert*, 2005 WL 1594085, at \*19 (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at \*5, 1998 Del. Ch. Lexis 133, at \*21 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del.1999));

134. *E.g.*, Hefter Decl. Ex. A, Ex. 13.1, at 11–12, 42 (Amended Excerpts from Trenwick 10–K, Amd. No 1, filed Aug. 22, 2000); Hefter Decl. Ex. C, at 13–14 (Trenwick 10–K filed Mar. 30, 2000).

135. *See* Del. Ch. Ct. R. 12(f).

136. Comp. ¶¶ 1, 47.

Trenwick in connection with the LaSalle merger and the creation of a new public holding company in 2000. Ernst & Young is alleged to have given accounting advice in connection with the reorganization of Trenwick's subsidiaries, allegedly to the effect that certain companies transferred to a Chartwell subsidiary in September 2000, had enough value to offset liabilities transferred to the same subsidiary.[137] In connection with the same reorganization, defendant Baker & MacKenzie allegedly advised Trenwick that the transfers involved complied with certain indentures requiring Trenwick to transfer substantially all of its assets to any company that would assume the obligations under the indentures.[138] Finally, defendant Milliman is alleged to have provided actuarial estimates to Trenwick in connection with the LaSalle transaction and the reorganization, as well in connection with the prior Chartwell merger.[139]

There is little in the complaint that addresses exactly what these advisors did that was professionally deficient. Rather, the complaint alleges in a conclusory way that the advisors "knowingly participated" in breaches of duty by the Trenwick and Trenwick America directors by "helping to conceal the true financial condition of the Trenwick Companies, manipulating the valuation and reserves of various of these companies, and/or signing off on the legitimacy of these transactions."[140] Milliman is further alleged to have acted wrongly "by certifying the reserve levels at Chartwell and concealing the true levels of those reserves" before the 1999 merger.[141] According to the complaint, all these advisors

were "aware of the Trenwick Companies' insolvency" at the time they were advising on the LaSalle merger and the reorganization.[142]

Notably, the complaint never specifically alleges that any of the advisors was employed by Trenwick America itself. Other than the bare reality that Trenwick went into bankruptcy nearly three years after the LaSalle merger, the complaint does not contain facts indicating that the advisors had been professionally deficient in working for Trenwick. The most specific allegation is that Baker & MacKenzie gave an erroneous opinion to Trenwick regarding certain indentures. In that respect, the complaint does not, as it could not for reasons I later explain, seek to bring a claim for breach of those indentures, as the Litigation Trust does not possess the right to bring claims under those indentures.

At the tail end of the complaint, the Litigation Trust purports to state a professional malpractice claim against the advisors, the entire sum and substance of which states:

136. The Trenwick Companies had an attorney-client relationship with Baker and accountant-client relationships with [Ernst & Young] and [PriceWaterhouseCoopers] and an actuary-client relationship with Milliman. As such, these entities are held to the standard of care that would be exercised by reasonably prudent professionals in their fields.[143]

137. The Professional Defendants breached their duties of care by failing to act with the diligence required and/or providing representation that lacked the

137. *Id.* ¶ 80.

138. *Id.*

139. *Id.*

140. *Id.* ¶ 121.

141. *Id.*

142. *Id.* at ¶ 122.

143. *Id.* ¶ 136.

minimum degree of skill, prudence[,] and knowledge. Specifically, the Professional Defendants breached their duties of care by helping to conceal the true financial condition of the Trenwick Companies, manipulating the valuation and reserve levels of various of these companies, and/or signing off on the legitimacy of the transactions in question. Milliman further breached its duty of care by certifying the reserve levels at Chartwell in 1999.[144]

138. As a result of the Professional Defendants' negligence, [Trenwick America] suffered injury for which Plaintiff seeks recovery.[145]

At bottom, the complaint simply alleges that big-dog advisors were on the scene when Trenwick acquired Chartwell and LaSalle, that Trenwick ultimately failed, and that in the post-Enron era, big-dog advisors should pay when things go wrong with their clients, even when a plaintiff cannot articulate what it is that the advisors did that was intentionally wrongful or even negligent.

Each of the defendant advisors has moved to dismiss the complaint against it on various grounds. I grant those motions for reasons that will be stated tersely.

■ First, because the complaint fails to state a claim for breach of fiduciary duty against the Trenwick or Trenwick America directors, the claims that the defendant advisors aided and abetted any underlying breach of fiduciary duty fails.[146]

As important, a claim for aiding and abetting involves the element that the aider and abettor have "knowingly participated" in the underlying breach of fiduciary duty.[147] The complaint is devoid of facts suggesting that any of the defendant advisors had any reason to believe they were assisting in a breach of fiduciary duty against Trenwick America, a wholly-owned subsidiary of Trenwick, by acting in the capacities they did for Trenwick, in particular in connection with non-self dealing mergers involving Trenwick's acquisition of other public companies.

Second, for identical reasons, the count in the complaint purporting to state a claim for "conspiracy to breach fiduciary duties" is equally defective.

■ Third, the fraud count in the complaint fails against the defendant advisors for the same reasons it fails against the Trenwick and Trenwick America directors. The allegations in the complaint do not satisfy Rule 9(b) and Trenwick America as an entity could not have reasonably relied to its detriment on statements of fact its board and sole owner allegedly knew to be false. Thus, without an underlying claim of fraud, the claim that the defendant advisors conspired with the boards of directors also fails.

■ Fourth, the so-called "malpractice" count is defective for several reasons. As an initial matter, Trenwick America has no right to bring a malpractice claim

144. *Id.* ¶ 137.

145. *Id.* ¶ 138.

146. *See, e.g., Malpiede v. Townson,* 780 A.2d 1075, 1096–97 (Del.2001) (explaining the existence of a viable underlying claim for breach of fiduciary duty is a necessary element of an aiding and abetting claim).

147. *See id.* ("A third party may be liable for aiding and abetting a breach of a corporate

fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach.") (citing *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984)); *Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116, 131 (Del. Ch.1986) (dismissing aiding and abetting and conspiracy to breach fiduciary duty claim because the plaintiff did not establish the defendants knowingly participated in the breach).

against advisors who worked solely for Trenwick. Any right to bring such a claim belongs to Trenwick as the client and not to its wholly-owned subsidiary. Thus, as to Baker & McKenzie, Ernst & Young, and Milliman, the claim fails because Trenwick was their client. I do not base my dismissal decision on this ground as to defendant PriceWaterhouseCoopers, which was engaged to audit not only Trenwick, but Trenwick America.

 Next, the malpractice claims fail to plead facts supporting an inference that the defendant advisors breached the standard of professional care owed by them. For example, as to defendant Milliman, an actuarial firm, the complaint simply states that Milliman's estimate that Chartwell's reserves at the time of its acquisition would be sufficient, when supplemented with $100 million in additional coverage, was wrong. The inflammatory allegations that Milliman must have known they were wrong or manipulated its certification are entirely conclusory and are not accompanied by factual context giving rise to the odor of purposeful wrongdoing or professional slack.[148] Notably, the Litigation Trust has not pled that Milliman warranted that if its estimates were wrong, it would be strictly liable. Indeed, to the contrary, the public documents the complaint draws upon contain heavy caveats regarding these estimates.[149] In addition, as the Second Circuit recognized, regardless of the actuarial method used, calcula-

tions of net worth for casualty risk reinsurers are not as firmly determinable as other financial line items.[150]

Likewise, as to defendants PriceWaterhouseCoopers and Ernst & Young, the complaint fails to plead any specifics regarding the deficiency in the accounting and valuation work that they performed. The Litigation Trust does not identify a single violation of generally accepting accounting principles or any other specific material misstatement of financial fact in the relevant financial statements. All that the complaint alleges is that the financial statements were false in some unspecified way and that these defendants participated with Trenwick in manipulating them and in facilitating Trenwick's acquisition strategy. The reason this must be so, the complaint infers, is that in August 2003, Trenwick and Trenwick America became insolvent.

As to Baker & McKenzie, the complaint is, admittedly, more specific. The complaint alleges that the law firm gave an erroneous opinion that a transfer of assets from Trenwick to Chartwell complied with the requirement that Trenwick transfer substantially all of its assets to an entity that would assume the obligations of those indentures. The reason that advice was given was to protect Trenwick against a claim under an indenture governing particular notes, not to protect Trenwick America. What the Litigation Trust fails to explain is that if this opinion was wrong, a matter that it does not try to prove at this

---

148. *See* Compl. ¶¶ 80, 86, 121, 137.

149. *E.g.*, Hefter Decl. Ex. A, at 12–13 (Trenwick 10–K, Amd. No. 1, filed Aug. 22, 2000); Hefter Decl. Ex. C, at 10–12 (Trenwick 10–K filed Mar. 30, 2000).

150. *See, e.g., Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1231 (2d Cir.1991) ("Consequently, regardless of the actuarial method used, the preparation of, and reliance upon a net worth calculation in a balance sheet for a casualty risk reinsurer is

based in large part upon informed guesswork. One cannot, therefore, expect equivalent certainty in a balance sheet's statement of loss reserves and its statement of more determinable items, such as outstanding principal and interest on debt instruments."); *see also Nat'l Distillers & Chem. Corp. v. Don W. Stephens*, 912 S.W.2d 30, 32 (Ky.1995) ("The law turns a blind eye towards attempts to restate the financial condition of a corporation once that condition has already been lawfully determined.").

stage, any claim would belong to Trenwick. Moreover, the proper party to sue Trenwick for any violation of the indenture would be the noteholders or the trustee under that particular indenture (as the case may be, in compliance with the indenture's terms) and not Trenwick America. Furthermore, even if a court might conclude that its view of the legal matter addressed in the Baker & McKenzie opinion was, on balance, different, that conclusion would not dictate that the law firm committed malpractice. In that regard, the complaint does not even attempt to plead facts supporting an inference that the opinion in question had no reasonable basis in law or fact. Given that the only asset not transferred in the transaction was an intercompany payable,[151] given that all of the remaining assets of Trenwick were transferred to Chartwell Re, and given that the assets transferred comprised approximately 81.6% of those assets backing the indentures (according to the Litigation Trust itself),[152] that inference would be hard to draw, if one assumes that the term in the indenture is to be interpreted consistently with its use in Delaware's jurisprudence under 8 *Del. C.* § 271.[153]

■ Instead of using the lengthy passages of the complaint it devoted to tarring the defendant advisors with allegations made against them in other contexts and with being somehow responsible for the permeation of an Enron-like culture throughout the American business community, the Litigation Trust should have done what it was supposed to do to plead a malpractice action. That would have involved factual allegations that each of the defendant advisors was engaged by Trenwick America to provide professional advice of a particular kind, specifying what the advisors did in those capacities, and identifying how what the advisors did fell short of applicable standards of care. Even under a notice pleading standard, a plaintiff must articulate facts supporting an inference that a professional acted without due care.[154]

Lastly, as to defendant Ernst & Young, the Litigation Trust is barred from proceeding in this court. The retention

---

**151.** In addition, the complaint never makes it clear how it would have helped Trenwick America if it had received an intercompany payable owed by another wholly-owned Trenwick subsidiary, Chartwell Re, to Trenwick. Trenwick became insolvent itself, in large measure according to the Litigation Trust because the relevant subsidiary, Chartwell Re, had inadequate reserves stemming from the period before it was acquired by Trenwick.

**152.** Compl. ¶ 80.

**153.** *See Hollinger Inc. v. Hollinger Intern., Inc.*, 858 A.2d 342, 377–78 (Del.Ch.2004) ("It would be less than candid to fail to acknowledge that the § 271 case law provides less than ideal certainty about the application of the statute to particular circumstances. This may result from certain decisions that appear to deviate from the statutory language in a marked way and from others that have dilated perhaps longer than they should in evaluating asset sales that do not seem to come at all close to meeting the statutory trigger for a required stockholder vote.") (citations omitted); *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 370, 371 n. 42 (Del.Ch.2002) (stating that determining what "substantially all" means in the context of 8 Del. C. § 271 can be an "amorphous inquiry" and that some cases have read it to mean about "half"); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 623 (Del.Ch.1999) (same).

**154.** *See, e.g., In re Parmalat Sec. Litig.*, 377 F.Supp.2d 390, 410 (S.D.N.Y.2005) ("Professional malpractice is governed by Rule 8, and plaintiff need only make a short and plain statement of the claim. The short and plain statement, however, must give the defendant notice of the nature of the claim. Simply asserting that [the accountant's] actions constituted malpractice is not sufficient for even this minimal standard. As the Second Circuit has explained, 'a simple declaration that defendant's conduct violated the ultimate legal standard at issue ... does not suffice. But it

agreement Ernst & Young signed with Trenwick contained a broad arbitration clause. Trenwick America, in the guise of the Litigation Trust, cannot seek to hold Ernst & Young responsible for malpractice it committed under a contract signed by Trenwick and then refuse to press its claim in the forum clearly agreed upon in that contract.[155]

For all these reasons, the counts against the professional advisors are all dismissed.

### III. *Conclusion*

It is no doubt regrettable that Trenwick and Trenwick America became insolvent. That insolvency no doubt injured their stockholders, creditors, customers, and employees. But the mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors on the scene just by pointing out that their business strategy did not pan out. If simple failure gave rise to claims, the deterrent to healthy risk taking by businesses would undermine the wealth-creating potential of capitalist endeavors. For that reason, our law defines causes of action that may be pled against business fiduciaries and advisors with care, in order to balance society's interest in promoting good-faith risk-taking and in

preventing fiduciary misconduct. The Litigation Trust has failed to meet its burden to plead facts stating claims of that kind against the defendants in this case.

The defendants shall prepare an implementing order, with notice as to form to the Litigation Trust. The parties shall bear their respective costs.

---

**155.** *See, e.g., Ishimaru v. Fung,* 2005 WL 2899680, at *18 (Del.Ch. Oct.26, 2005) ("One of the primary justifications for estopping a signatory from denying a non-signatory a right to arbitrate is that it is unfair for the signatory to have it both ways by attributing to a non-signatory the duties of a contract signatory for purposes of pressing claims but denying the non-signatory the right to invoke the arbitration clause."); *In re Kaiser Group Int'l, Inc.,* 307 B.R. 449, 457 (Bankr.D. Del. 2004) ("courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing

the arbitration clause despite having never signed the agreement ... The policy driving this theory is that a non-signatory should be prevented from embracing a contract and then turning its back on those portions of the contract which it finds distasteful.") (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 (3d Cir.2001)); *see also Town of Smyrna v. Kent County Levy Court,* 2004 WL 2671745, at *4 (Del.Ch. Nov.9, 2004) ("equity will not allow a party to sue to enforce the provisions of a contract that it likes, while simultaneously disclaiming provisions that it does not") (citing approvingly *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir. 2000)).

is enough to assert facts from which, construing the complaint liberally and in the plaintiff's favor, one could infer such a violation.' ") (quoting *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001)).